**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ELLEN V. ELLIS,
Plaintiff-Appellant,

v.

No. 96-2711

METROPOLITAN LIFE INSURANCE
COMPANY,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Robert G. Doumar, Senior District Judge.
(CA-95-1003-2)

Argued: July 18, 1997

Decided: September 10, 1997

Before ERVIN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Senior Judge Butzner and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** John Bertram Mann, LEVIT & MANN, Richmond, Vir-
ginia, for Appellant. Alvin Pasternak, New York, New York, for
Appellee. **ON BRIEF:** Gregory D. Zahs, New York, New York, for
Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Plaintiff-Appellant Ellen V. Ellis (Ellis) appeals from an order granting Defendant-Appellee Metropolitan Life Insurance Company's (MetLife) cross-motion for summary judgment and denying her own. Ellis had sought review in district court of MetLife's final determination that she was ineligible for long-term disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. Ellis alleged that MetLife had improperly denied her her benefits and engaged in procedural errors in contravention of the statutory and regulatory requirements of ERISA. We affirm.

I.

Ellis was a branch manager for NationsBank Corporation whose principal duties related to originating mortgage loans. She participated in NationsBank's Long Term Disability Plan (Plan). The Plan is an employee welfare benefit plan governed by ERISA, and it is funded by MetLife.

> The Plan vests MetLife, a fiduciary under the Plan, with discretionary authority to interpret the terms of the plan and to determine eligibility for and entitlement to plan benefits in accordance with the terms of the plan.
>
> Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the determination was arbitrary and capricious.

J.A. at 101. The terms of the Plan provide, in pertinent part, that a participant is "disabled" if

> due to an Injury or Sickness, [the participant] require[s] the regular care and attendance of a Doctor . . . and:

2

> (1) [the participant is] unable to perform each of the material duties of [her] regular job . . . .

J.A. at 92.

In August 1993, Ellis submitted a long-term disability claim form in which she declared that she suffered from blurred vision, balance problems, and chronic pain which precluded her from driving, reading, sitting, or standing for any length of time without rest. She indicated that she believed her disability arose from a dental visit procedure that occurred in April 1992, five days after which she admitted herself to a hospital. MetLife subsequently initiated its review procedure.

At MetLife's request, Ellis's health care providers submitted medical information relating to her claim. Her primary treating provider, Michael Porvaznik, D.O., informed MetLife that, in his opinion, Ellis was disabled, and he diagnosed her difficulties as being due to somatic dysfunction. Records submitted by other health care providers, however, indicated that the etiology of her problems was undetermined, that the results of a neurological examination were normal, and that there were no known limitations on her return to work.

In November 1993, MetLife referred Ellis's claim file to the Independent Board Certified Physicians Roundtable (Roundtable), an independent medical consulting group, for an assessment of Ellis's condition. The Roundtable members who reviewed Ellis's file consisted of an internal medicine and neurology specialist, an internal medicine and cardiology specialist, and an orthopedic surgeon. This panel concluded that no medical diagnosis for her condition could be confirmed. The panel suggested the possibility of an underlying psychiatric disorder, but no such evidence had been submitted to them. Functional ability on the basis of a psychiatric disorder could not be assessed. Nonetheless, assuming that each of Ellis's symptoms were present, the panel concluded that Ellis ought to be able to lift various weights, to walk or stand for three to four hours a day in divided periods, and to sit for eight to ten hours a day.

Based on the Roundtable's findings, MetLife denied Ellis's claim in a letter dated December 9, 1993. MetLife explained why her claim

3

was denied, informed her of the Roundtable's conclusions, notified her that she could request further review within 60 days, and explained that additional documentation could be submitted for review.

Ellis did seek further review, and Porvaznik compiled additional medical reports and information. Porvaznik himself characterized Ellis's problem as severe and disabling but admitted that the etiology remained unclear. Reports by other providers, however, were again inconclusive. A neurobehavioral profile revealed that Ellis possessed "considerable strengths in the majority of skills assessed, including sensory-perceptual abilities, general intellectual abilities, and executive functioning skills." J.A. at 167. That report concluded that "[a]lthough her symptoms are very real, and do apparently preclude her resumption of her previous lifestyle, it is difficult to pinpoint etiology of symptoms with any degree of certainty." J.A. at 168. A further head and neck examination, MRI, audiogram, and otoscopic examination yielded normal results. A physical therapist reported that Ellis's performance on one test was consistent with a patient who has sensory organization dysfunction. Another report suggested that Ellis appears to have a predisposition to fibromyalgia and recommended a treatment of progressive aerobic exercise. And yet another report could find no evidence of neurological disease but admitted that the reported symptoms were incapacitating.

MetLife submitted this new material to the Roundtable, which added a psychiatrist to the panel of the original three members. Based on all the information supplied, the Roundtable, in a May 16, 1994, report, suggested that there was a reasonable basis for a probable diagnosis of fibrositis or fibromyalgia but that it could not be confirmed.[1] Still, assuming that fibrositis or fibromyalgia was present, as well as a memory deficit, a peripheral vestibular disorder, and some element of depression or dysthymia,[2] the Roundtable determined that there

_____

[1] Fibrositis or fibromyalgia is a "group of common nonspecific illnesses characterized by pain, tenderness, and stiffness of joints, capsules, and adjacent structures." Taber's Cyclopedic Medical Dictionary (16th ed. 1989).

[2] Dysthymia is a "morbid anxiety and depression accompanied by obsession." Webster's Third New International Dictionary 712 (1993).

4

was no incompatibility between Ellis's functional capacity and her work requirements, even though her functional limitations could have been over-estimated.

Rather than continue to deny Ellis's claim based on this report, MetLife instead provided copies of the report to Ellis's health care providers to seek their comments. In particular, MetLife requested that they address whether Ellis was totally disabled with respect to her occupation of bank branch manager and to submit objective medical evidence of her continuing disability. Only a few of the health care providers responded. Additional testing of Ellis was arranged, however, and MetLife continued to accept and consider evidence through January 1995. The new reports continued to give a wide variety of assessments. One neuro-psychologist, for example, suggested that the environment of the banking industry, especially NationsBank's merger with Sovran Bank and its attendant layoffs, created the potential for "secondary gain" because of Ellis's access to long-term disability benefits. See J.A. at 238. A clinical social worker, however, discounted that hypothesis, believing that Ellis had been earning more than $100,000 annually whereas her disability payments would amount to only $28,000 annually. See J.A. at 245. A statement by NationsBank placed Ellis's annual earnings at approximately $38,700. See J.A. at 107.

MetLife submitted all of this data for a third time to the Round-table. In place of the specialist in internal medicine and cardiology, a specialist in internal medicine and rheumatology was substituted; the three other panel members remained the same as on the second panel. In a report of February 4, 1995, the panel concluded that a diagnosis of fibrositis remained probable. But again, assuming that diagnosis, as well as symptoms of muscle tightness, pain, and ocular convergence, the panel determined that Ellis ought to be able to lift even greater weights than indicated before, walk and stand six to eight hours a day, and sit for eight to ten hours a day. This functional capacity was yet again found not to be medically incompatible with Ellis's work requirements.

Following this review of its earlier denial, MetLife informed Ellis on March 28, 1995, that its decision remained the same and that her file was closed.

5

Ellis filed this action on October 12, 1995, alleging (1) that MetLife had failed to give her adequate written notice of the reasons for its denial of her claim, (2) that she was not given a full and fair review, and (3) that the denial violated the terms of the Plan and ERISA. Following cross-motions for summary judgment, the district court granted MetLife's motion and denied Ellis's. The court determined that, considering the inconclusive evidence of the conflicting reports of Ellis's own health care providers as well as the three determinations of the Roundtable, substantial evidence supported MetLife's denial decision. MetLife, therefore, had not abused the discretion vested in it by the Plan, notwithstanding the slight possibility of a financial conflict of interest. The court also concluded that MetLife had substantially complied with the applicable regulations interpreting ERISA in its denial letters and that, because MetLife had done more than was required to permit Ellis to present her claim, there was no question that she had received a full and fair review.

This appeal followed.

II.

Over the last few years, we have developed a well-settled framework for review of the denial of benefits under ERISA plans. Where a plaintiff is appealing the grant of summary judgment, we engage in a de novo review, applying the same standards that the district court employed. See Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997). In cases where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan, the denial decision must be reviewed for abuse of discretion. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111, 115 (1989); Brogan, 105 F.3d at 161; Bedrick v. Travelers Ins. Co., 93 F.3d 149, 152 (4th Cir. 1996); Bernstein v. CapitalCare, Inc., 70 F.3d 783, 787 (4th Cir. 1995); Doe v. Group Hospitalization & Medical Servs., 3 F.3d 80, 85 (4th Cir. 1993). Under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently. See Bruch, 489 U.S. at 115; Brogan, 105 F.3d at 161; Haley v. Paul Revere Life Ins. Co., 77 F.3d 84, 89 (4th Cir. 1996); Bernstein, 70 F.3d at 787; Fagan v. National Stabilization Agreement of the Sheet Metal Indus. Trust Fund, 60 F.3d 175,

6

180 (4th Cir. 1995); Doe, 3 F.3d at 85. Such a decision is reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Brogan, 105 F.3d at 161 (quoting Bernstein, 70 F.3d at 788).

As an initial matter, a reviewing court determines de novo whether the ERISA plan confers discretionary authority on the administrator or fiduciary and, if so, whether the administrator or fiduciary acted within that discretion. See Haley, 77 F.3d at 89. In the instant case, there is really no question that MetLife possessed discretionary authority to determine Ellis's entitlement to benefits and that MetLife's denial was plainly within that scope. The parties do not dispute this and the Plan's language is crystal clear. See supra part I. (quoting Plan language). We must therefore review MetLife's denial decision for an abuse of that discretion vested in MetLife.

Ellis argues, however, that we should determine her eligibility for benefits de novo because MetLife, as both fiduciary of the Plan's beneficiaries and the Plan's insurer, suffers from a conflict of interest. Again, we have established a well-developed framework for considering such conflicts of interest in a court's reviewing calculus. The Supreme Court has recognized that where a plan administrator or fiduciary is vested with discretionary authority and is "operating under a conflict of interest, that conflict must be weighed as a `factor[ ] in determining whether there is an abuse of discretion.'" Bruch, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (1959)). Because ERISA plans are governed by trust principles, this factor is just one of several that a court should consider in determining whether an administrator or fiduciary has abused the discretion vested in it. We have recently stated that a reviewing court should consider, to the extent relevant,

> (1) the scope of the discretion conferred; (2) the purpose of the plan provision in which the discretion is granted; (3) any external standard relevant to the exercise of that discretion; (4) the administrator's motives; and (5) any conflict of interest under which the administrator operates in making its decision.

Haley, 77 F.3d at 89 (citing Restatement (Second) of Trusts § 187 cmt. d (1959)). As we recently explained in Bedrick v. Travelers

7

Insurance Company, the court applies the conflict of interest factor, on a case by case basis, to lessen the deference normally given under this standard of review only to the extent necessary to counteract any influence unduly resulting from the conflict:

> [W]hen a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

Bedrick, 93 F.3d at 152 (harmonizing Bruch and circuit law and quoting Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995) (quoting Doe, 3 F.3d at 87), cert. denied, 116 S. Ct. 1043 (1996)); see also Martin v. Blue Cross & Blue Shield of Va., Inc. , 115 F.3d 1201, 1206 (4th Cir. 1997).

It therefore appears that in no case does the court deviate from the abuse of discretion standard. Instead, the court modifies that abuse of discretion standard according to a sliding scale. The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

In the instant case, it is clear that an administrator or fiduciary, free of MetLife's conflict of interest, would have been more than reasonable in exercising its discretion to deny Ellis benefits under the circumstances of this case. The decision maker had before it three separate reports of the independent Roundtable. [3] Each of these reports

_____

[3] It is worth noting that Ellis presented no evidence that the Roundtable is not independent of MetLife or that MetLife somehow unduly influences the Roundtable's evaluation.

concluded that there was no conclusive diagnosis of Ellis's condition. Each also assessed her functional limitations, even assuming her symptoms and certain possible diagnoses. The first report implicitly, and the second two explicitly, found no incompatibility between her functional capabilities and the physical requirements of her job as a bank branch manager. These reports constitute a substantial basis on which an objectively reasonable decision maker could determine that Ellis was not disabled within the terms of the Plan.

But MetLife had before it not just these reports by the Roundtable specialists but also all the data submitted by Ellis and her health care providers. Although Ellis's osteopath, Porvaznik, as well as several other health care providers, opined that Ellis was, in fact, disabled, there was no consensus on a diagnosis of Ellis's condition or even on whether there was a medical cause for her symptoms. Indeed, a number of her examiners indicated that she retained "executive functioning skills," that she could engage in various forms of physical exercise, and that she could return to work on a reduced schedule. One report even suggested that the possibility that Ellis was embellishing her symptoms for potential secondary gain warranted serious consideration. Based on this conflicting data, but supported by the independent medical assessment of the Roundtable, MetLife determined that Ellis was not "unable to perform each of the material duties of [her] regular job" "due to an injury or sickness" and thus that she was not disabled within the meaning of the Plan. [4] Despite MetLife's conflict of interest, which, as the district court noted, was greatly mitigated by its substantial reliance on the evaluations of the independent Roundtable, we conclude that MetLife did not abuse its discretion in denying Ellis benefits. MetLife's decision was based on substantial evidence, and its lengthy and thorough review evinces a deliberate, principled reasoning process.

_____

[4] Ellis argues that the Roundtable's evaluation of her functional capacity should be discounted in light of her health care providers' determination of her disability. That is, the treating provider's conclusion should trump that of the reviewing physician, since the former had the opportunity to examine the patient while the latter had only the cold paper record to go by. We need not, and do not, reach this issue, as it is evident that Ellis's own providers had not reached a consensus that she was disabled in any sense of the word (vis-a-vis the meaning within the Plan), let alone that she could not perform the material duties of her job.

As fiduciary, MetLife must serve the best interests of all Plan beneficiaries, not just the best interest of one potential beneficiary. Faced with conflicting evaluations by the claimant's own health care providers, no conclusive diagnosis, and three separate reports of an independent panel of medical specialists finding no incompatibility between her functional limitations and her job requirements, a fiduciary free of any conflict of interest would have been more than reasonable in rejecting Ellis's claim and preserving the Plan's funds for those beneficiaries who satisfy the Plan's definition of "disabled."

III.

In addition to challenging MetLife's denial of benefits, Ellis also alleged procedural errors in contravention of ERISA's statutory law and its applicable regulations. Section 503 of ERISA requires that an adequate notice, "setting forth the specific reasons for [the] denial, written in a manner calculated to be understood by the participant," as well as the opportunity for a full and fair review, must be given to any participant whose claim is denied. 29 U.S.C.§ 1133. Ellis claims both that her notice was deficient and that her review was not full and fair.

A.

ERISA regulations elaborate specifically what a denial notice must contain:

> (1) The specific reason or reasons for the denial;
>
> (2) Specific reference to pertinent plan provisions on which the denial is based;
>
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
>
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

10

29 C.F.R. § 2560.503-1(f). Whether MetLife's denial notice complied with this regulation is a question of law subject to de novo review. See Brogan v. Holland, 105 F.3d 158, 165 (4th Cir. 1997). As we recently re-emphasized in Brogan, substantial compliance with the spirit of the regulation will suffice, for "[n]ot all procedural defects will invalidate a plan administrator's decision." Id.; see also Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 127 (4th Cir. 1994). Substantial compliance exists where the claimant is provided with "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Brogan , 105 F.3d at 165 (internal quotation marks and citations omitted).

In the instant case, MetLife's denial letter of December 9, 1993, explained that Ellis's claim was denied because her functional limitations did not adversely impact her ability to perform the duties of her job, quoted the relevant Plan language defining"totally disabled," informed her of the Roundtable's conclusions, notified her that she could request further review within 60 days, and explained that additional documentation could be submitted for review. **5** In all material

_____

**5** The denial letter states in pertinent part:

> The policy states:
>
> "Total Disability" or "Totally Disabled" means the Employee:
>
> **-** is completely and continuously unable to do each of the material duties of his job; and
>
> **-** requires the regular care and attendance of a Physician.
>
> [. . .]
>
> We have reviewed the extensive medical information submitted by your physicians, Michael Porvaznik, M.D. [sic], Francis Hunter, M.D., and Robert Allen, M.D. and subsequently, referred their reports to a Board Certified Physicians Roundtable. This Roundtable was unable to support your claim of inability to perform the duties of your own occupation. This is based entirely on the physicians' evidence submitted on the restrictions/limitations you claim to have from headaches, vertigo, and syncopal spells.
>
> According to the medical records available, no specific cause of continued syncopal spells exists. These records indicate the prior

11

respects, MetLife substantially complied with each of the ERISA regulation's requirements.

Ellis argues that the denial notice was deficient because it failed to inform her of the information she needed to provide in order to perfect her claim. In particular, she asserts that the Roundtable's report, which was not provided to her with the denial letter, but which she later obtained, apparently during discovery, states that "additional diagnosis and evaluations would be of merit or merit consideration." Br. of Appellant at 41. Her argument is that, had she known this information, she would have known what medical proof she needed in order to prove her disability. Ellis's argument is fundamentally flawed in two respects.

---

> relatively good relief of dizziness and nausea by meclizine, the absence of any balance, coordination or vestibular abnormalities on clinical exam, the absence of any neurologic abnormalities of the facial or trigeminal nerve on clinical exam, and the lack of any medical indication of loss of higher cognitive function.
>
> Based on the above information, we are unable to give this claim favorable consideration from the claim effective date of August 31, 1993.
>
> We want you to understand that our decision in this matter has been based solely upon information contained in our file. As such, we are willing to answer any questions or to review any further material you would care to submit which may have an effect upon consideration given to this claim.
>
> [. . .]
>
> You may request a review of the claim **within *60* days of the denial date** by writing directly to Group Insurance Claims Review, Metropolitan Life Insurance Company, at the address indicated in this letter. . . . When requesting this review, you should state the reason you believe the claim was improperly denied and you may submit any data, questions or comments to Metropolitan you deem appropriate. Metropolitan will reevaluate all the data and you will be informed in a timely manner of our findings.

J.A. at 159-60 (bold and underlining in original).

First, Ellis entirely misconstrues what the Roundtable report says. That report actually states:

> The above functional capacities do not assume that any major improvement has occurred with treatment. However, such might be obtainable with additional diagnosis. As noted above, the fluctuating visual field loss may be due to migraine phenomena, which have specific treatments for prevention that have not been used. Evaluation for significant postural hypotension, and its treatment if found, may also be of merit. The other alternative, of psychiatric cause, also may merit consideration.

J.A. at 146. The report does not say that if Ellis were diagnosed or evaluated for certain conditions that such conditions would prove her disability. Instead, the report states that, were her diagnosis known, then improvement in her functional capacities might be obtained through appropriate, directed treatment. What Ellis fails to understand is that, even without such diagnosis, treatment, or improvement, her functional capacities are such that she was deemed able to perform her job duties.

Second, and more importantly, MetLife, in its denial letter, informed Ellis of what she needed to do in order to obtain a review of her claim pursuant to 29 C.F.R. § 2560.503-1(f)(4). MetLife was <u>not</u> requiring any further information from Ellis to perfect her claim under 29 C.F.R. § 2560.503-1(f)(3). Her claim was already complete and perfected; no additional information was necessary for MetLife to process it and render a decision in her case. These two provisions of the content of notice regulation are distinct and operate independently. Subsection (f)(3) is only implicated when there remain unresolved, material factual questions about which a plan administrator or fiduciary must have information in order to review the denial of a claim. <u>See Brehmer v. Inland Steel Indus. Pension Plan</u>, 114 F.3d 656, 661-62 (7th Cir. 1997). Ellis has somehow conflated these purposes and come to the erroneous belief that MetLife is under an obligation to inform her of what she needs to tell MetLife in order to obtain disability benefits. That is not MetLife's role as a fiduciary. MetLife must treat each claimant with procedural fairness, but, because it must also guard against improper claims, it is not its duty

13

to affirmatively aid claimants in proving their claims. MetLife's denial letter of December 9, 1993, substantially complies with the applicable ERISA regulations in all material respects.

B.

Ellis also alleged that the review she obtained was not full and fair. The applicable regulation provides that every ERISA plan must establish procedures under which a full and fair review may be obtained. These procedures must, at a minimum, permit the claimant to

> (i) Request a review upon written application to the plan;
>
> (ii) Review pertinent documents; and
>
> (iii) Submit issues and comments in writing.

29 C.F.R. § 2560.503-1(g)(1). Once a decision on review is reached, the regulations further require that

> [t]he decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the claimant, as well as specific references to the pertinent plan provisions on which the decision is based.

29 C.F.R. § 2560.503-1(h)(3).

It appears that neither party really comprehends what these regulations require. MetLife argues, and the district court agreed, that the review of Ellis's claim that it provided was more than eminently full and fair. MetLife, for example, sent the Roundtable's second report to Ellis's health care providers and allowed them the opportunity to critique it. It subsequently repeatedly extended the deadline for Ellis's providers to submit evidence on her behalf, and then submitted all the data to the Roundtable yet a third time before it finally decided to uphold its original denial and close Ellis's case. Ellis for her part argues that she never received any of the Roundtable's reports and that the third report in particular was crucial since she claims the

14

Roundtable specifically requested that Ellis be psychiatrically evaluated according to a list of questions it prepared. Both miss the point.

The full and fair review procedural requirements serve two complementary purposes. They are designed to permit a plan's administrators to resolve disputes in an efficient, streamlined, non-adversarial manner. At the same time, the procedures ensure that a plan participant is protected from arbitrary or unprincipled decision-making. See Weaver v. Phoenix Home Life Mut. Ins. Co., 990 F.2d 154, 157 (4th Cir. 1993). Both the specific minimum procedural review requirements of subsection (g)(1) and the notice requirements of the decision on review of subsection (h)(3) have been read as ensuring that a full and fair review is conducted by the administrator, that a claimant is enabled to prepare an appeal for further administrative review or recourse to the federal courts, and that the courts can perform the task, entrusted to them by ERISA, of reviewing a claim denial. See Wilczynski v. Lumbermens Mut. Cas. Co., 93 F.3d 397, 402 n.3 (7th Cir. 1996) (interpreting 29 C.F.R. § 2560.503-1(g)(1)(ii)); Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 693 (7th Cir. 1992) (interpreting 29 C.F.R. § 2560.503-1(h)(3)). Compliance that substantially fulfills these goals suffices.

What Ellis fails to understand is that the initial decisional process and the subsequent review process are distinct. While it appears that Ellis did request a review in writing and submit her disputed issues in writing in accordance with 29 C.F.R. § 2560.530-1(g)(1)(i) & (iii), it is unclear from the record before us whether she ever requested, either in writing or in verba, to review the pertinent documents pursuant to 29 C.F.R. § 2560.530-1(g)(1)(ii). On the other hand, MetLife did not provide these documents on its own initiative, in particular the first report of the Roundtable on which it so heavily relied in its initial denial of Ellis's claim. The opportunity to review the pertinent documents is critical to a full and fair review, for by that mechanism the claimant has access to the evidence upon which the decision-maker relied in denying the claim and thus the opportunity to challenge its accuracy and reliability. See Wilczynski, 93 F.3d at 402; Halpin, 962 F.2d at 689. Again, although the initial denial letter and the subsequent review process are distinct, there is some support for the view that, by informing a claimant of the steps to be taken to initiate the review process, in accordance with 29 C.F.R. § 2560.530-1(f)(4),

15

there is an implicit obligation on the part of the administrator to inform a claimant that she may review pertinent documents. See Grossmuller v. International Union, United Auto. Aerospace and Agric. Implement Workers of America, Local 813, 715 F.2d 853, 858 & n.5 (3d Cir. 1983) (stating, in the context of analyzing the statutory and regulatory meaning of "full and fair review," that the "fiduciary must also inform the participant of what evidence he relied upon and provide him with an opportunity to examine that evidence and to submit written comments or rebuttal documentary evidence"). This MetLife did not do. What is implicit in the ERISA regulations we now make explicit: A plan administrator or fiduciary must inform a claimant that, should she desire to submit her claim for review following an initial denial, she is entitled to review the pertinent documents upon which the initial denial decision was predicated.

The notice requirement for the decision on review must be every bit as explicit as an initial denial notice in terms of providing specific reasons for the continued denial and specific references to the pertinent plan provisions. Compare 29 C.F.R. § 2560.503-1(h)(3) with id. § 2560.503-1(f)(1) & (2). What is not required, because not relevant at this stage of the administrative review, is notice regarding how to perfect a claim or how to seek review. Cf. 29 C.F.R. § 2560.503-1(f)(3) & (4).

MetLife's "decision on review" letter of March 28, 1995, states in toto:

> Your request for a subsequent review of your Long Term Disability termination of benefits has been completed.
>
> This reply constitutes our final response in your ERISA appeal.
>
> Review of your claim under ERISA has previously been completed and our decision remains the same.
>
> Your Long Term Disability file remains closed.
>
> Should you have any questions or concerns, you may contact us at the listed number.

16

J.A. at 269. On its face, this letter is baldly deficient in specific refer- ences to the reasons for the decision and contains no references to the pertinent Plan provisions.

It is plain that MetLife has not followed the letter of the applicable ERISA regulations concerning its review of Ellis's claim denial. In the first place, MetLife ought to have informed Ellis that she could review the documentary evidence that MetLife relied upon in reach- ing its initial decision. In this particular case, the most critical docu- ment was the Roundtable's first report. In the second place, MetLife also failed to provide its rationale for its continued denial with the requisite specificity. On the other hand, Ellis also complains that she was never provided with the second and third Roundtable reports. Although it was incumbent upon MetLife to describe the Round- table's analysis to the extent MetLife based its decision on that analy- sis, MetLife was under no duty to provide these latter two reports to Ellis as part of the review procedures.

Were the regulations to be strictly construed as written, then, due to these procedural defects, Ellis did not receive a full and fair review. What is not written, however, but what is implicit in their nature, is that there must be a causal connection between these defects and the final denial of a claim. Although Ellis did not review the first Round- table report, she informs us that what is important about that docu- ment is that the Roundtable believed that certain diagnoses would have merited consideration. However, as explained above, Ellis entirely misconstrues what that report says. It is apparent that had Ellis had the report, the data she could have submitted to MetLife would not have materially affected the Roundtable's subsequent anal- yses. Two additional factors, beyond her misunderstanding of the report's contents, make this plain. First, Ellis was, in fact, examined by a variety of different specialists who sought to make diagnoses of her condition, including psychologists and psychiatrists. By her (mis)- understanding, the Roundtable sought evaluations by psychologists or psychiatrists, and she acquired that evidence independently. Evi- dently, she was not prejudiced by not reviewing the report. Second, MetLife provided a copy of the Roundtable's second report to Ellis's health care providers. This second report was even more detailed than the first, and it made clear that the available data on her functional limitations did not preclude her from engaging in the physical tasks

17

of her profession. By providing this second report for critique and permitting Ellis and her health care providers to submit additional data in response, MetLife, in effect, neutralized any harm it may have caused by not informing Ellis that she could have reviewed the first report. We can see no causal link between MetLife's failure to inform Ellis that she could review pertinent documents and the ultimate denial of her claim.

Similarly, although MetLife's "decision on review" letter appears woefully deficient on its face, it does state that the "decision remains the same." We note that the purpose of the specificity requirements in the notice provision is to permit the claimant to adequately prepare an appeal to the federal courts and for those courts to properly review the decision. See Wilczynski, 93 F.3d at 402 n.3; Collins v. Central States, Southeast and Southwest Areas Health and Welfare Fund, 18 F.3d 556, 561 (8th Cir. 1994); Halpin, 962 F.2d at 693. Because the record before us, as before the lower court, contains all of the documentary evidence that MetLife relied upon in reaching its decision, and it is clear, as discussed above, that MetLife did not abuse its discretion in denying Ellis's claim based upon that evidence, Ellis has in no way been prejudiced by the deficiencies in MetLife's "decision on review" letter. Indeed, the district court interpreted the conclusion that MetLife's "decision remain[ed] the same" as making it plain to Ellis that the lack of medical documentation of her affliction was the cause of the denial. Whether this be so, these deficiencies obviously are not causally related to MetLife's ultimate denial, and Ellis has been able to effectively prosecute her appeal in the federal courts. Moreover, it would be pointless for us to vacate the decision below and remand with instructions to the lower court that it should, in turn, remand this matter to MetLife with instructions that it provide Ellis with the specific reasons for its continued denial, since those reasons are now apparent to all. Lex non praecipit inutilia, quia inutilis labor stultus.

We do not believe that this disposition makes the review procedures of 29 C.F.R. § 2560.503-1(g)(1) or the notice provisions of 29 C.F.R. § 2560.503-1(h)(3) toothless. We emphasize that MetLife is saved in this instance only because the substance of the review that MetLife did provide to Ellis was full and fair, even though it did not technically comply with all of ERISA's procedural requirements.

18

Although we do not say that MetLife substantially complied with the requirements, we do conclude that MetLife substantively complied with the spirit and intent of a full and fair review in this particular case. Ellis was not subject to an arbitrary or unprincipled decision-making process. Hereafter, MetLife, as well as other plan administrators and fiduciaries, would be well advised to ascertain their compliance with these ERISA procedural requirements.

IV.

Based on the foregoing analysis of Ellis's three allegations, we affirm the grant of summary judgment to MetLife and its denial to Ellis.

AFFIRMED

19