UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROBERT FRIZ,
              *Plaintiff-Appellant,*

              v.

J&H MARSH & MCLENNAN,
INCORPORATED; J&H MARSH &
MCLENNAN, INCORPORATED,
Acquisition Severance Pay Plan;
EDWARD P. PAZICKY, Plan
Administrator,

              *Defendants-Appellees.*

No. 00-1940

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-00-1173-AMD)

Argued: December 7, 2000

Decided: January 22, 2001

Before WIDENER and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion. Judge King wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Francis Joseph Collins, KAHN, SMITH & COLLINS, P.A., Baltimore, Maryland, for Appellant. William George Miossi,

WINSTON & STRAWN, Washington, D.C., for Appellees. **ON BRIEF:** Christine C. Stein, WINSTON & STRAWN, Washington, D.C., for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

**OPINION**

PER CURIAM:

Robert Friz (Friz) appeals the district court's entry of judgment in favor of J&H Marsh & McLennan, Inc. (Marsh), an insurance brokerage company, the J&H Marsh & McLennan, Inc. Acquisition Severance Pay Plan (the Marsh Severance Pay Plan or the Plan), and Edward Pazicky (Pazicky), the administrator for the Plan. In the district court, Friz sought review of Pazicky's determination that he was ineligible for enhanced severance benefits under the Plan, an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* For the reasons stated below, we affirm.

I

In November 1998, Marsh & McLennan Companies, Inc. (MMC), the parent of Marsh, acquired Sedgwick, Inc. (Sedgwick). As a result of the acquisition, Sedgwick was merged into various subsidiaries of MMC.

On January 4, 1999, Marsh sent by email a memorandum (the Broadcast Memo) to all Marsh employees in the United States informing them that the acquisition of Sedgwick would result in certain staff reductions. Although the Broadcast Memo was sent to all Marsh employees in the United States, Friz, a vice-president in Marsh's Baltimore, Maryland office at the time, contends he did not

receive it; in any event, Friz did have access to the memo from his computer on Marsh's Lotus Notes database.

The Broadcast Memo explained that those employees laid off in connection with the reduction-in-force would be eligible for severance benefits under a "Merger Severance Pay Plan." The Broadcast Memo explained that, under the proposed Merger Severance Pay Plan, separating employees would be eligible for one of two types of severance benefits: basic or enhanced. According to the Broadcast Memo, basic severance benefits consisted of two weeks base salary paid in a lump sum to all employees terminated under the Merger Severance Pay Plan. Enhanced severance benefits provided greater benefits, but the Broadcast Memo indicated that the receipt of those benefits was expressly contingent upon signing "a waiver and release agreement in the form provided by the company that includes a specific clause on non-solicitation of both accounts and employees of the company."

The Marsh Severance Pay Plan went into effect on March 31, 1999 and terminated on December 31, 1999.[1] The Plan provided that its purpose was "to provide severance pay and benefits to eligible [Marsh] employees" terminated as a result of the acquisition of Sedgwick. The Plan provided that eligible employees would be entitled to one of two types of severance benefits, either basic or enhanced.

Under the Plan, basic severance benefits consisted of two weeks base salary, paid in a lump sum two weeks following termination. An employee was eligible for enhanced severance benefits if the employee signed "a Waiver and Release Agreement in a form prepared by the Company ("Waiver and Release"), and such Waiver and Release becomes effective by its terms."[2] Thus, unlike the language

---

[1]The parties seem to agree that the Plan, as contained in the record, contains two documents, one entitled "J&H Marsh & McLennan, Inc. Acquisition Severance Pay Plan Summary Plan Description," and the other entitled, "J&H Marsh & McLennan, Inc. Amended Merger Severance Pay Plan." Unless we specify otherwise, when we refer to the Plan, we are referring to the J&H Marsh & McLennan, Inc. Acquisition Severance Pay Plan Summary Plan Description.

[2]The J&H Marsh & McLennan, Inc. Amended Merger Severance Pay Plan employs similar but not identical language. It provides that an

contained in the Broadcast Memo, the Plan did not contain a specific clause pertaining to the solicitation of both accounts and employees of Marsh. Enhanced severance benefits were calculated by using a seniority formula, with a minimum benefit consisting of four weeks base salary, plus a $1,500 to $3,500 allowance for health benefits continuation, out-placement assistance, and other benefits.

On January 31, 1999, Friz was selected for termination in conjunction with MMC's acquisition of Sedgwick. On April 15, 1999, Friz received written notification of his termination. At that time, he was offered a "Change of Employment Status/Waiver and Release Agreement" (the Agreement). The Agreement provided that in exchange for $89,440 and other benefits, Friz would release any real or potential claims against Marsh and forego his right to solicit certain customers and employees of Marsh for one year.

By the terms of the Agreement, Friz had a forty-five day period, or until May 31, 1999, to consider its terms and accept it. Friz did not sign the Agreement during the forty-five day period or any time thereafter, nor did he raise any questions or issues concerning the scope of the Agreement during this period. Thus, under the Plan, he qualified only for basic severance benefits, which he received in due course. The record reflects that Friz chose not to accept the Agreement because he intended to, and apparently did in fact, solicit Marsh's clients.

On October 28, 1999, Friz initiated an administrative appeal under the Marsh Severance Pay Plan regarding his failure to qualify for enhanced severance benefits. According to Friz, he was entitled to enhanced severance benefits because the Plan did not condition the receipt of enhanced severance benefits on the non-solicitation of both accounts and employees of Marsh. After review, Pazicky denied Friz's claim for the following reasons: "(1) the Plan's language expressly provided that the terms of the Waiver and Release would be prepared" by Marsh and "Friz failed to sign the Waiver and

---

employee will be eligible for enhanced severance benefits if the employee signs "a Waiver and Release Agreement prepared by the Company."

Release" as prepared by Marsh; "(2) Friz failed to sign the Agreement within the forty-five day period as required under the Plan; (3) the non-solicit clause was reasonable in that it was narrowly drawn"; (4) the Agreement offered generous compensation; and (5) "as early as January 4, 1999, Friz, along with all other potential participants, had been advised that the Waiver and Release would include a 'specific clause on non-solicitation of both accounts and employees'" of Marsh.

On March 14, 2000, in the Circuit Court for Baltimore City, Maryland, Friz filed a complaint against Marsh, the Marsh Severance Pay Plan, and Pazicky to recover under ERISA the enhanced severance benefits denied to him by Pazicky. After the case was removed to the United States District Court for the District of Maryland in April 2000, Marsh, the Plan, and Pazicky filed a motion to dismiss, or in the alternative, for summary judgment. After full briefing on the motion and oral argument, the district court issued an order on June 27, 2000 granting the defendants' motion and dismissing Friz's complaint with prejudice. The district court held that Pazicky's interpretation of the Plan to deny Friz's claim for enhanced severance benefits was reasonable. Friz noted a timely appeal.

II

Decisions by plan administrators are generally reviewed *de novo*. *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112 (1989). However, if the plan gives the plan administrator discretionary authority to determine eligibility or to construe the terms of the plan, our review of the plan administrator's decision is for an abuse of discretion. *See Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). Under this deferential standard, we will not disturb the decision of the plan administrator if it is reasonable, even if we would have reached a different conclusion independently. *See id.* Whether a plan gives the plan administrator discretionary authority is a question we review *de novo*. *See id.* at 233.

In this case, there is really no question that Pazicky possessed discretionary authority to determine Friz's entitlement to enhanced severance benefits under the Plan. The parties essentially do not dispute

this, and the Plan's language is crystal clear on this point.[3] Therefore, we must determine if Pazicky exercised his discretion reasonably. *See id.* at 232.

In assessing the reasonableness of a plan administrator's decision, we may consider, but are not limited to, such factors as:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342-43 (4th Cir. 2000).

Applying these factors, we conclude that Pazicky's decision denying Friz enhanced severance benefits was reasonable. First, his decision was consistent with the language of the Plan. The Plan provided that eligibility for enhanced severance benefits was contingent upon an employee executing a "Waiver and Release Agreement in a form prepared" by Marsh. Marsh prepared a "Waiver and Release Agreement" and presented it to Friz for execution. In the Agreement, Friz was asked to, in exchange for $89,440 and other benefits, release Marsh from liability, waive any real or potential claims against

---

[3]On this point, the Plan provides:

> The Plan Administrator shall have the responsibility and the discretionary authority to interpret the terms of this Plan, to determine eligibility for benefits, and to determine the amount of such benefits. The Plan Administrator may award additional benefits under this Plan at his sole discretion. The interpretation and determinations of the Plan Administrator shall be final and binding unless determined by a court of competent jurisdiction to be arbitrary and capricious.

Marsh, and waive his right to solicit certain customers and employees of Marsh for one year. As a consequence of his failure to execute the Agreement, Friz was only entitled to basic severance benefits, which he received.[4]

Second, Pazicky's decision was consistent with the purposes and goals of the Plan. The purpose of the Plan was "to provide severance pay and benefits to eligible [Marsh] employees" terminated as a result of the acquisition of Sedgwick, and the Plan provided that eligible employees would be entitled to one of two types of benefits, either basic or enhanced. In accordance with the terms of the Plan, Friz received the benefits to which he was entitled, thus fulfilling the purposes and goals of the Plan.

Third, the materials considered by Pazicky in reaching his decision, primarily the Plan and the Agreement, were adequate and fully support the reasonableness of his decision.[5]

Fourth, Friz does not argue and the record does not reflect that the provisions of the Plan have been inconsistently applied to the Marsh employees terminated in 1999 as a result of the Marsh-Sedgwick merger. Indeed, it appears that no employee who elected not to execute the Agreement received enhanced severance.

Fifth, Pazicky's decisionmaking process was reasoned and principled. In his decision, Pazicky reviewed the Plan's language in a rea-

---

[4]We note that Pazicky was under the mistaken belief that the Plan required Friz to execute the Agreement by May 31, 1999 to secure enhanced severance benefits. Rather, the Agreement, and not the Plan, contained the forty-five day provision.

[5]Secondarily, Pazicky considered the Broadcast Memo, expressing the view that, through it, Friz was on notice that the Agreement would contain a specific provision containing a waiver of the right to solicit clients and employees of Marsh. Friz contends that Pazicky erred when he considered the Broadcast Memo in rendering his decision. We need not address this argument because, in rendering his decision, Pazicky primarily considered the Plan and the Agreement, not the Broadcast Memo. Thus, Pazicky's consideration of the Broadcast Memo does not undermine the reasonableness of his decision.

sonable manner and applied that interpretation to Friz. In addition, there is no dispute that, administratively, Friz had an opportunity to litigate his claim.

Sixth, Pazicky's decision was consistent with the procedural and substantive requirements of ERISA. As noted above, Pazicky's decision was consistent with the language of the Plan. Further, Friz was fully aware of his rights and obligations under the Plan. To receive basic severance benefits, he had to do nothing; to receive enhanced severance benefits, he had to execute the "Waiver and Release Agreement" prepared by Marsh. He chose the former.

With regard to factor seven, any external standard relevant to the exercise of discretion, and factor eight, the fiduciary's motives and any conflict of interest it may have, Friz contends that Pazicky, as an employee of Marsh, acted under a conflict of interest. A plan administrator's "conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a discretionary decision" of that plan administrator. *Booth*, 201 F.3d at 343 n.2. A conflict of interest reduces the deference to the degree necessary to "neutralize any untoward influence resulting from that conflict." *Doe v. Group Hospitalization & Medical Servs.*, 3 F.3d 80, 87 (4th Cir. 1993). In other words, "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." *Ellis*, 126 F.3d at 233.

In this case, even if Friz could demonstrate a conflict of interest, our review would be confined to determining whether Pazicky's decision was objectively reasonable. *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999). Applying this standard, for essentially the same reasons set forth above, we conclude that Pazicky's decision was objectively reasonable as a matter of law.

### III

In summary, our consideration of the *Booth* factors leads to the inescapable conclusion that Pazicky's decision denying Friz enhanced

severance benefits was reasonable. Accordingly, we affirm the judgment of the district court.

*AFFIRMED*

KING, Circuit Judge, dissenting:

The ultimate issue in this case is simple: Does a "Waiver and Release Agreement" reasonably encompass a non-solicitation clause? It plainly does not, and I respectfully dissent.

## I.

This issue arises in the context of a plan administrator's construction of an ERISA benefit plan.[1] By its terms, the Plan provided, inter alia, that an employee would be eligible for enhanced severance benefits if he signed "a Waiver and Release Agreement in a form prepared by the Company[.]" The district court granted judgment to Marsh, determining that Friz could be required to execute a Waiver and Release Agreement containing a non-solicitation clause. I disagree, and I would reverse.

## II.

## A.

As the majority observes, we accord substantial deference to a plan administrator's eligibility determination when the plan vests the administrator with discretionary authority to construe it. *See Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). To pass muster, however, Pazicky's construction of the Plan must be objectively reasonable. *See id.*[2] I am convinced that Pazicky's decision to deny

---

[1]The ERISA plan to be construed is the J&H Marsh & McLennan, Inc. Acquisition Severance Pay Plan (the "Plan"), as exclusively set forth in the Summary Plan Description.

[2]Where, however, a conflict exists between the interests of the plan administrator and the employee, the deference accorded the administrator is reduced to "the extent necessary to counteract any influence unduly

Friz enhanced benefits was, as a matter of law, unreasonable and inconsistent with the plain and unambiguous provisions of the Plan.

B.

In assessing Pazicky's decision to deny Friz his enhanced benefits, we must confine our analysis to the terms of the written Plan as it was presented to the employees (the Plan's prospective beneficiaries). While the Plan expressly conditioned receipt of enhanced benefits on the signing of "a Waiver and Release Agreement in a form prepared by the Company," it did not further define the agreement, and it contained no reference to a non-solicitation clause.

Marsh insists that it had, by means of its so-called Broadcast Memo of January 4, 1999, *ante* at 2-3, informed its employees that the Waiver and Release Agreement would "includ[e] a specific clause on non-solicitation of both accounts and employees of the company." While Friz denies receiving the Broadcast Memo, this point is a red herring. Put simply, neither this fugitive document nor its contents were embodied in the written Plan. An ERISA plan may be construed *only* by its written terms, without reference to unincorporated ancillary documents. *See* 29 U.S.C. § 1104(a)(1)(D) (establishing the duty of plan fiduciaries to act solely "in accordance with the documents and instruments governing the plan.").

Although Marsh was entitled to amend the Plan — and to incorporate into it a non-solicitation provision — it did not do so. Because Marsh did not so amend the Plan, Pazicky could not rely on the Broadcast Memo in determining the scope of the Waiver and Release Agreement. Likewise, in evaluating the reasonableness of Pazicky's construction, we must limit our analysis to the contents of the Plan itself.

---

resulting from the conflict." *Ellis*, 126 F.3d at 233. While Pazicky faced a serious conflict of interest in this case — since his expansive interpretation of waiver and release would necessarily accrue to his employer's benefit — we need not resolve the precise scope of any deference owed, as Pazicky's construction of the Plan was patently unreasonable.

## C.

Construing the Plan to encompass a non-solicitation provision per-verts the plain meaning of the terms "waiver" and "release," consid-ered either separately or in combination. For example, Black's Law Dictionary defines "waiver" as "[t]he voluntary relinquishment or abandonment . . . of a legal right or advantage." *Black's Law Dictionary* 1574 (7th ed. 1999). Similarly, that text defines "release" as "[t]he relinquishment or concession of a right, title, or claim." *Id.* at 1292.

In this circumstance, it would have been reasonable to expect the Waiver and Release Agreement to cover all claims Friz could raise against Marsh, such as discrimination claims or compensation dis-putes, arising from his employment or termination. Presumably, Friz's execution of such an agreement would be valuable to Marsh, sparing the company the uncertainty and expense of potential law-suits. While Marsh would also derive considerable value from a non-solicitation agreement, such a provision involves a distinct type of forbearance on the part of Friz. Whereas a waiver and release would preclude former employees from pursuing claims against Marsh — in particular, claims arising out of (past) events — a non-solicitation agreement inhibits the employee from engaging in (future) business conduct.[3]

---

[3]Indeed, the draft Waiver and Release Agreement prepared by Marsh implicitly regarded the waiver and release as entirely distinct from the non-solicitation clause. The unexecuted agreement provided in part:

> In exchange for providing you with the above referenced pay-ments . . ., you agree to waive all claims against the Company and release and discharge the Company from liability for any claims or damages that you may have against it as of the date of this Agreement, whether known or unknown to you. *This waiver and release includes*, but is not limited to, *any claims arising under any federal, state or local law or ordinance* . . . .

J.A. 37-38 (emphasis added). The prohibition against solicitation fol-lowed in a separate clause:

> You *also* agree that for the one year period following termina-tion, you will not, directly or indirectly, solicit, divert, or take

### III.

Under the Plan's terms, Marsh retained control over the specific *form* of the Waiver and Release Agreement. Marsh was entitled to prepare the agreement, but it was nonetheless constrained by the essential nature of a waiver and release. When Marsh inserted the non-solicitation clause into the Waiver and Release Agreement, it added an invalid condition to which Friz could not reasonably be held.

I believe the district court erred in its disposition of Friz's claim, and I respectfully dissent.

---

    away, in whole or in part, any clients or prospects of the Company . . . .

J.A. 38 (emphasis added). Thus, the agreement itself treated the waiver and release as a discrete provision, to which the non-solicitation clause was simply appended.