UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CHARLES W. CROSSMAN, JR.,
            *Plaintiff-Appellant,*

v.

MEDIA GENERAL, INC.; MEDIA
GENERAL SHORT TERM DISABILITY
INCOME PLAN; MEDIA GENERAL LONG
TERM DISABILITY PLAN,
            *Defendants-Appellees.*

No. 00-1762

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-99-681-3)

Argued: April 2, 2001

Decided: May 15, 2001

Before MOTZ and GREGORY, Circuit Judges, and
Frederic N. SMALKIN, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

## COUNSEL

**ARGUED:** John Bertram Mann, LEVIN, MANN & HALLIGAN,
Richmond, Virginia, for Appellant. Steven David Brown, WIL-
LIAMS, MULLEN, CLARK & DOBBINS, P.C., Richmond, Vir-

ginia, for Appellees. **ON BRIEF:** Sean M. Gibbons, WILLIAMS, MULLEN, CLARK & DOBBINS, P.C., Richmond, Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

### OPINION

PER CURIAM:

This is an appeal from a decision of the District Court granting judgment in favor of an ERISA (Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461) plan administrator against a plan disability claimant. For the reasons stated below, we affirm the decision of the District Court.

The facts peculiar to this case are largely undisputed, and we state them as stipulated or as found by the District Court in the absence of stipulation.

The appellant, Charles Crossman, was, from 1973 until October 26, 1996, an employee of Media General, serving as a mechanic and pilot in the company's flight department. He held a commercial pilot's license, which allowed him to receive compensation for acting as a pilot in command of aircraft, including the company-owned aircraft, but only when he was in possession of a valid medical certificate issued by an Aviation Medical Examiner (AME) pursuant to Part 67, 14 C.F.R. See 14 C.F.R. (FAR (Federal Aviation Regulation)) section 61.3(c) (2000). Mr. Crossman experienced some chest discomfort in mid-July, 1996, and consulted his family physician (not an AME) on July 19, 1996. His doctor recommended a standard (non-thallium) coronary stress test, which was performed on July 29, 1996, and which yielded a result that the District Court termed "suspicious and abnormal."

Meanwhile, quite apart from — and with no knowledge of — Mr. Crossman's medical problems, Media General decided to do away with its flight department, giving Mr. Crossman notice of that fact on August 5, 1996, in a letter that outlined the company's plans to sell the company aircraft in favor of leasing from Executive Jet (essentially a time-sharing arrangement). Mr. Crossman was asked to stay on as an employee until November 30, 1996, "to fly our folks as in the past" and "to fly [the plane] on demonstration flights" for prospective purchasers. In the event, the plane was sold, and the flight department liquidated, as of October 25, 1996.

On August 19, 1996, Mr. Crossman underwent coronary vessel angiography, which, as later summarized by Senior AME Dr. Hudson, showed "significant coronary artery disease in 2 vessels, the most significant being the R Coronary artery which is 85% blocked. The L Anterior Descending artery is 50% blocked in one of its branches."

The next day, Mr. Crossman sent his supervisor a memo stating his understanding that he had three blocked arteries, his medical certificate had been revoked, and that he could no longer fly any aircraft.*

Meanwhile, Mr. Crossman applied for both short-term and long-term disability benefits under Media General's self-administered ERISA plan. At the time of his application, benefits under the long-term plan were funded through a Voluntary Employee Beneficiary Association ("VEBA") Trust. (Later, such benefits became payable out of the company's general assets.) Mr. Crossman's applications for both short-term and long-term disability benefits were denied both initially and on reconsideration, and this suit followed.

The threshold issue in this case, like all ERISA cases, is to determine the appropriate standard of judicial review of the plan adminis-

---

*In fact, however, his medical certificate was not formally revoked or suspended at that point, but remained in force until formally suspended by Dr. Hudson on November 29, 1996. Mr. Crossman was nonetheless prohibited from exercising the privileges of his pilot's license on account of his known medical deficiency, under FAR § 61.53(a)(1). The parties have stipulated, though, that the prohibition on Mr. Crossman's acting as pilot in command was, or became, permanent.

trator's decision. The issue of what standard of review should be employed by the District Court is, of course, an issue of law over which we exercise *de novo* review. *Myles Lumber Co. v. CNA Financial Corp.*, 233 F.3d 821, 823 (4th Cir. 2000).

The District Court decided to employ a deferential standard of review, determining that the plan, though self-funded by the time of trial, was, at the time of the challenged denial of benefits, governed by the terms of the VEBA Trust, making it more akin to one administered by a disinterested administrator than a self-funded one. The VEBA Trust, as funded at the time of the Crossman claim, contained over $300,000 that could only be used to pay disability claims and for plan administration purposes. Given the existence of the VEBA Trust, the District Court did not err in treating the plan administrator's discretionary decision (and there is no contention that the decision was not discretionary under the plan's language) with deference under the law of this Circuit, in view of the absence at that time of a direct benefit to the company from denying a claim. *See, e.g., Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir. 1997). Even accepting the appellant's argument that the plan administrator here was not totally disinterested simply because of the VEBA trust, any modification thereby of the degree of judicial deference due to the plan administrator's decision in this case, *see Ellis*, 126 F.3d at 233, would not, we believe, have made any difference in the district court's analysis, nor does it in ours.

Although the initial and final decisions in this case denying long-term benefits were not models of strict compliance with ERISA's procedural requirements, strict compliance is not the appropriate standard. What is required is "substantial compliance," a question for the court to decide. *See Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997). Here, both the initial denial decision (Mr. Tosh's letter of April 22, 1997) and the final denial decision (Mr. Tosh's letter of August 19, 1997) adequately referred to the provisions of the plan under which the decisions were made, and, although they did not inform the employee of the steps needed to obtain further review, there was no prejudice therefrom, as the present claims were properly preserved for both administrative and judicial review. Similarly, the Court does not view the absence of formal, written delegations of authority to Mr.

Tosh to be in substantial disregard of ERISA's requirements, as everyone involved recognized him as the decision-maker.

Turning to the substance of the benefit denials, there is no serious question raised as to the denial of short-term benefits, as the District Court found, and the appellant does not contest, that in order to obtain short-term benefits, the employee must have been "absent from work" due to his or her medical problem, and Mr. Crossman was physically present for work — though he did not fly — during the relevant time period.

That same factor — Mr. Crossman's physical presence at work until the bitter end of the flight department on October 25, 1996 — is highly significant in reference to his quest for long-term disability benefits, as well, for, up until the end of October (his claims for both short and long-term disability benefits having been submitted in early October), Mr. Crossman continued to report for work in the flight department, where he performed such duties (as so found by the District Court) as "cancel[ling] credit cards, providing notification regarding the closing down of the flight department, reviewing files, breaking down equipment and answering the flight department telephone." The District Court found that those duties were within Mr. Crossman's customary duties as per his job description.

Resort to Mr. Crossman's 1994 job description shows that 70% of his duties involved actual flight, which required a medical certificate, while the remaining 30%, such as obtaining weather conditions (pre-flight), preparing and reviewing weight and balance calculations, making hotel and ground transportation reservations for the flight crew, and preparing paperwork for flight operations, though customarily performed by a pilot, could be performed by anyone with the necessary aeronautical skill and/or general business experience. (Indeed, in the case of scheduled carriers, weather data gathering and flight planning is typically done by a non-flying aircraft dispatcher. *See* FAR Part 65, subpart C.)

Turning to the final denial of long-term benefits, the decision of the plan administrator rested, *inter alia*, upon his interpretation of the plan language defining a long-term disability. That language, in pertinent part, provides that disability "means the inability of a Participant

to perform *all of the customary duties of his position with the Company as a result of . . . disease. . . .*" (Emphasis added.)

The plan administrator took the position that, because Mr. Crossman could, and, indeed, did perform some of his duties in the flight department up until its closing without hindrance from his coronary artery disease, he was not thereby precluded from performing "all" of the customary duties of his position.

The appellant contends that the plan administrator simply misread the plan language, which should be interpreted just the opposite way, *viz.*, that an employee is disabled if he is unable to perform *any* of the customary duties of his position with the company.

We cannot say that the plan administrator abused his discretion by giving the plan language its plain meaning. If the plan had meant "all of the customary duties" to mean "any of the customary duties," it could and would have said so. Here, where the pilot's customary duties included both flying and non-flying activities, the fact that he could — and did — continue to perform non-flying duties up until the abolition of his position for non-disability connected reasons precludes this Court from concluding that the plan administrator abused his discretion in interpreting and applying the plan language. The Court rejects the appellant's invitation to give determinative weight to the omission of the complete phrase "all of the customary duties" in the July 24, 1995, notice to plan participants issued when the current definition of long-term disability was adopted. In that notice, plan participants were told, *inter alia*, that the "definition of disability has been changed to mean the inability of a participant to perform the duties of his regular occupation with the company due to illness or injury." Where there is a conflict between the language of a plan and its summary description, the plan language must control, so long as there has been no detrimental reliance on, or other prejudice to the applicant arising from, the summary description. *Martin v. Blue Cross and Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1204 (4th Cir. 1997). Here, Mr. Crossman cannot make out the required level of reliance on, or other prejudice (for example, refraining from obtaining other professional pilot insurance against loss of medical certification) from, the language used in the summary description.

Thus, the decision of the District Court is

*AFFIRMED.*