**Joanne PAPPAS, Plaintiff,**

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY, Defendant.**

No. 97–1400–A.

United States District Court, E.D. Virginia, Alexandria Division.

Aug. 21, 1998.

Kenneth E. Labowitz, Elizabeth G. Engle, Dingman Labowitz, PC, Alexandria, VA, for Plaintiff.

Randolph D. Frostick, Cheryl A. O'Neil Duncan, Vanderpool, Frostick & Massey, P.C., Manassas, VA, for Defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This matter comes before the Court on the parties' cross motions for summary judgment. At issue in this case is whether defendant Reliance Standard Life Insurance Company ("Reliance") abused its discretion in finding plaintiff ineligible for long-term disability benefits under an employee welfare benefit plan governed by ERISA.[1]

### I.

Plaintiff, a 28–year old licensed CPA, began working as a financial reporting manager for PHP Healthcare Corporation ("PHP") in 1992. In addition to supervising the work of several staff accountants, plaintiff's main duties related to the preparation of consolidated financial statements, balance sheets, and income statements. Performance of these tasks required regular use of the computer, telephone, and financial calculator, and like most office jobs, frequent walking, standing, sitting, kneeling and reaching overhead.

Plaintiff participated in PHP's Long Term Disability Insurance Plan ("Plan"), an employee welfare benefit plan governed by ERISA, and funded by Reliance. Pursuant to the terms of the Plan, covered employees are entitled to receive disability benefits provided that the insured is "Totally Disabled,"

---

1. Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*

and "submit[s] satisfactory proof of Total Disability to [Reliance]." [2] The terms of the Plan also provide, in pertinent part, that a participant is "Totally Disabled" if:

[A]s a result an Injury or Sickness:

(1) during the Elimination Period and for the first 36 months for which a Monthly Benefit is payable, [an insured] cannot perform the material duties of [his/her] regular occupation;

(a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness [an insured is] capable of performing the material duties of [his/her] regular occupation on a part-time basis or some of the material duties on a full-time basis. [An insured who is] Partially Disabled will be considered Totally Disabled, except during the Elimination Period.

On April 30, 1995, plaintiff slipped and struck her head against a car door while in the parking lot of her apartment complex. The impact was severe. Although she was not knocked unconscious, plaintiff was "disoriented" by the blow. The following morning, plaintiff awoke with a headache and nausea, symptoms that increased throughout the day, ultimately prompting her to leave work and visit the Arlington County Hospital emergency room, where a neurological examination was performed. The results were normal, and plaintiff was released. Nevertheless, plaintiff's symptoms persisted, and on May 3, 1995, plaintiff visited Dr. Wilson

Coudon, the first of many physicians she would consult regarding her head injury. Dr. Coudon concluded that plaintiff was suffering from "post-concussion syndrome," a condition that, in his opinion, could persist for several months. Nonetheless, based on a CT scan of her brain that revealed no abnormalities,[3] Dr. Coudon was optimistic that she would, in time, make a full recovery. Dr. Coudon wrote to PHP on May 10, indicating that while plaintiff could return to work, her ability to perform the essential functions of her job would depend on the severity of the symptoms: "she will have good days and bad days."

Dr. Coudon's prognosis was proved to be essentially accurate. Over the next several months, plaintiff enjoyed at least one virtually symptom-free period during which her activities, including her work, were not significantly curtailed. Yet, at other times, plaintiff experienced severe headaches, a sensation of pressure in her head, nausea, intolerance to motion, light, and noise, bleeding from the ear canal, and lightheadedness accompanied by impaired concentration and vision. On some days, plaintiff was able to work through the symptoms, which varied in intensity, although she had difficulty concentrating and was forced to take extended breaks to alleviate the pain. On other days, the symptoms were incapacitating, and plaintiff was forced to take leave from work altogether.[4] Plaintiff visited a series of physicians during this period, all of whom were optimistic that the symptoms would subside.[5] Nevertheless, by the end of September, 1995,

2. The insuring clause of the Plan provides, in full:

We will pay you a Monthly Benefit if you:

(1) are Totally Disabled as the result of a Sickness or Injury covered by the Policy;

(2) are under the regular care of a Physician;

(3) have completed the elimination period; and

(4) submit satisfactory proof of Total Disability to us.

3. An MRI was also performed at a later date, the results of which were also normal.

4. Plaintiff took sick leave almost immediately following the accident, from May 1–12, 1995. After returning to work for a period of one month, during which time her symptoms ranged from negligible to intense, plaintiff again took sick leave from June 12–17, 1995.

5. For example, plaintiff visited Dr. A. Chalmeta, a neurologist, on May 26, 1995. Dr. Chalmeta concluded that plaintiff had suffered a "mild concussion and muscle contracture," but expected that plaintiff's symptoms would clear "in the near future." Thereafter, on June 21, 1995, plaintiff consulted a second neurologist, Dr. David Grass, who concluded that plaintiff suffered from a post-traumatic nervous instability syndrome. Dr. Grass also noted the possibility of a labyrinthine concussion. He, too, felt, confident that while her headaches might persist for some period, she would ultimately "do well." Dr. Grass encouraged plaintiff to resume her normal activities as much as she could tolerate.

plaintiff's symptoms had not subsided and indeed had even intensified. On October 6, 1995, plaintiff ceased working completely. Even so, she did not abandon her effort to keep her job, and in November, 1995, she attempted to work for PHP from home. This effort was less than successful, as she found her symptoms were substantially aggravated by working for even one to two hours, forcing her to take a one or two hour break before resuming any work-related activities. Yet, by operating in this manner, alternating brief periods of work and rest, plaintiff was able to work five to ten hours per day during the week of November 12–17, 1995. This schedule did not last, however, as from November 18 through November 21, plaintiff experienced severe, immobilizing headaches that precluded all work activity.

Dissatisfied with the results of her treatment up to that time, plaintiff visited Dr. Stuart Stark, a board certified neurologist, who continues to serve as plaintiff's treating physician. At her initial visit on December 6, 1995, Stark indicated that her symptoms—persistent headaches, ear aches, motion sickness, dizziness, and vertigo with sudden movements—were all consistent with an atypical Post–Traumatic Migraine Disorder ("PTMD").[6] Dr. Stark prescribed medication for plaintiff's headaches, and also recommended a migraine diet and stationary exercises, to the extent tolerable. By February 1996, plaintiff noted some mild improvement in her overall condition, but she continued to experience symptoms on a daily basis. And, while plaintiff continued her attempts to work at home, she no longer tried to work five to eight hours per day. Dr. Anthony Casolaro, a general practice physician who saw plaintiff on several occasions, wrote a letter to PHP on February 20, 1996, describing her limitations:

> [Plaintiff] continues to have symptoms on a daily basis. She is up to working at home, approximately one to two hours per day and we are hopeful that in the next six weeks she will be able to increase that to four hours per day.

Frustrated by the persisting symptoms, and her resulting inability to return to PHP's offices, plaintiff, in February 1996, submitted a claim to Reliance for long-term disability benefits. In her claim, she declared that she suffered from severe headaches, ear aches, nausea and lightheadedness, all of which made it very difficult, if not impossible, for her to concentrate, think, or tolerate the noise and light in a normal office environment. She also stated that "[h]ead and eye movement, required for desk work and computer work, aggravate my symptoms." Reliance reviewed plaintiff's initial claim submissions,[7] and thereafter attempted to gather all of plaintiff's medical records from the previous year. Reliance also requested that each of plaintiff's physicians submit medical information, and in particular, complete a Physical Capabilities Form relating to plaintiff's claim.[8]

Meanwhile, as Reliance processed plaintiff's claim for benefits, plaintiff's condition did not improve. Indeed, on May 21, 1996, Dr. Stark noted that plaintiff continued to experience symptoms on a daily basis, and

6. Shortly thereafter, on December 18, 1995, a second physician, Dr. Richard Lewis, a physician with the department of neurology at Johns Hopkins University, confirmed this diagnosis. Noting that her most prominent symptom at the time was "severe, essentially constant headaches" accompanied by nausea, Dr. Lewis concluded that plaintiff's condition "[m]ost likely..represents a post-traumatic migraine disorder although her symptoms are somewhat atypical."

7. This submission included plaintiff's personal statement, a job analysis, PHP's statement, an executed authorization for medical records, a list of all of her health care providers, and a statement by her primary treating physician, Dr. Stark, who identified her condition as PTMD,

and listed her symptoms as including "head pain, in varying intensities and incapacitating at times; nausea, hypersensitivity to light and noise; ear aches and pains, motion sickness."

8. Many of plaintiff's early treating physicians declined to complete the Physical Capabilities Form, citing their limited involvement with plaintiff. The exception, it appears, was Dr. Chalmeta, who approximately one year after seeing plaintiff indicated that she was able to work an eight-hour day, although paradoxically noting his inability to "comment on her present symptoms." Dr. Stark also completed the form, stating his opinion that plaintiff could not work an eight-hour day.

that she "remain[ed] unable to work."[9] And, because her condition had been essentially unresponsive to Dr. Stark's attempts at medical management, plaintiff was referred to Dr. Brian Mondell of the Baltimore Headache Institute at Johns Hopkins University. On June 10, 1996, Dr. Mondell diagnosed plaintiff's condition as a "post-traumatic intractable migraine; post-traumatic syndrome," thereby confirming Dr. Stark's diagnosis. Dr. Mondell also concluded that plaintiff was unable to work, noting that she was experiencing constant headaches, and that any activity requiring head and eye tracking movements exacerbated her condition and aggravated her symptoms.

On July 8, 1996, Reliance forwarded plaintiff's claim file to Carol Matikiewicz, R.N., for an assessment of plaintiff's condition. After reviewing the file, Nurse Matikiewicz concluded that plaintiff's medical records did not support a finding of disability, noting specifically that there were no objective findings, only often conflicting subjective complaints. Thereafter, Carmella Sharp, a Reliance assistant manager, concurred in the decision to deny plaintiff's claim.

Based on Matikiewicz's findings, Reliance denied plaintiff's claim in a letter dated August 1, 1996. In this letter, Reliance explained that notwithstanding the diagnosis of her condition as PTMD, the lack of objective medical documentation of her condition was fatal to her claim. Specifically, Reliance stated that:

> because there is no objective medical documentation to support our [sic, your] subjective complaints, and there are conflicting reports of your being symptom free to do your regular activities, your claim must be denied.

The letter concluded that "the preponderance of the objective medical evidence indicates that your condition did not at the time you ceased [working] preclude you from performing the material duties of your regular occupation." Finally, the letter advised plaintiff that she could request further review within 60 days, and explained that additional documentation could be submitted in support of her claim.

Plaintiff accepted this invitation and sought further review. On September 27, 1996, her attorney formally appealed the decision, submitting a detailed letter in response to Reliance's denial of long-term disability benefits. Plaintiff provided a collection of literature explaining the nature of PTMD, including articles from medical journals, excerpts from text books, and letters written from leading doctors in the field of headache and migraine medicine. Further, plaintiff submitted the June 10, 1996 evaluation note of Dr. Brian Mondell,[10] and a September 26, 1996 letter written by Dr. Stark in response to Reliance's denial of benefits. In his letter, Stark reiterated his conclusion that plaintiff was "unable to perform her job duties and tasks because they aggravate her present symptoms," and thus was "disabled from working, full time or part time." And, addressing Reliance's justification for its denial, Dr. Stark wrote that symptoms of PTMD are by nature "subjective," and that objective findings are neither necessary for the diagnosis, nor expected in patients suffering from the disorder.

Upon receipt of plaintiff's appeal, Reliance sent the entire claim file to Dr. Paul Shipkin, a board certified neurologist, for peer review. In his report dated January 24, 1997, Dr. Shipkin questioned neither the existence, nor the severity, of plaintiff's symptoms,[11] and

**9.** As Reliance correctly points out, Dr. Stark also wrote to PHP on May 21, 1996, indicating that plaintiff could "return to work for as many hours per day as tolerated." The letter was, in fact, written at plaintiff's request. Dr. Stark's evaluation notes from May 21 state, in pertinent part, that:

> The patient mentions that she would like to return to work, [and] expresses concerns about losing her job. She has asked if I will write her a letter in support of her returning to

work, as tolerated, and that doing so will not exacerbate her neurologic condition.

In any event, plaintiff never took advantage of the release, and never felt able to return to PHP after October 5, 1995.

**10.** Apparently, Reliance had not received a copy of Dr. Mondell's evaluation during its initial evaluation of plaintiff's claim.

**11.** Indeed, he stated specifically that "her complaints are valid."

recommended that she be followed closely by a neurologist. Moreover, his report confirmed the diagnosis of plaintiff's condition as PTMD.[12] Nevertheless, Dr. Shipkin concluded that "there is no objective data to support disability." [13] Subsequently, Dr. Shipkin provided a one sentence clarification to his report which stated that "it is my opinion that [plaintiff's] symptoms appear valid (consistent with the diagnosis of migraine) but do not prevent her from working."

Following this review of its earlier denial, Reliance notified plaintiff on February 13, 1997, that her appeal had been denied, and that the decision was again informed by the lack of objective medical evidence supporting her claim of disability.

On September 5, 1997, plaintiff filed this three-count complaint alleging:

I.  that Reliance failed to give her adequate written notice of the reasons for its denial of her claim in violation of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(f);

II.  that Reliance wrongfully denied her long-term disability benefits in violation of 29 U.S.C. § 1132; and

III.  that Reliance failed to provide her with requested Plan documents in violation of 29 U.S.C. § 1132(c)(1).

Following a hearing on the parties' cross-motions for summary judgment, the Court (1) granted Reliance's motion for summary judgment as to the claimed procedural errors alleged in Counts I and III,[14] but (2) granted in part plaintiff's motion for summary judgment on Count II, finding that an impermissible basis was relied upon in denying plaintiff's claim for benefits. *See* Order, *Pappas v. Reliance Standard Life Ins. Co.*, No. 97–1400–A, (E.D.Va. February 6, 1998). Specifically, plaintiff's claim for benefits was denied for want of "objective medical evidence," even though the Plan requires no such evidence, and though certain disabling conditions may exist without any objective physical signs or evidence. Accordingly, the matter was remanded to the Plan Administrator for a further review of the record, and for a redetermination of whether plaintiff was entitled to disability benefits without using the lack of "objective medical evidence" as a complete bar to plaintiff's claim.[15]

Following its third review of plaintiff's claim for disability benefits, Reliance again concluded, by letter dated March 17, 1998, that its denial of benefits was proper. Specifically, based on a review of the record as a whole, Reliance found that plaintiff's symptoms did not prevent her from performing the material duties of her regular occupation

---

12.  Specifically, Dr. Shipkin noted that "her neurologic condition has evolved to a posttraumatic vascular headache syndrome (migraine)."

13.  In addition to noting the lack of objective medical evidence, Dr. Shipkin's report expressed his belief that plaintiff's condition would soon improve:

> Her prognosis for recovery is reasonably good with signs and symptoms of post-concussion syndrome usually resolving by three to six months in most patients. However, a distinct minority of patients may have persistent symptoms and cognitive deficits for additional months. Risk factors ... include age over 40 years, lower educational, intellectual, and socioeconomic level, female gender, history of alcohol abuse, prior head injury and multiple trauma. None of these risk factors apply to [plaintiff] except for the fact that she is female, therefore, I believe she will gradually improve over subsequent months.

14.  With regard to Count I, Reliance's denial letter "substantially complied" with the require-

ments of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1(f), as it "permitted a sufficiently clear understanding of the administrator's position to permit effective review." *See Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir.1997) (substantial compliance with the spirit of the regulation will suffice). Accordingly, defendant's motion for summary judgment was granted as to Count I. With regard to Count III, the record revealed that plaintiff never made a request for "all plan documents", as alleged, and thus had no claim under 29 U.S.C. § 1132(c)(1). Defendant's motion for summary judgment was therefore granted as to Count III.

15.  The Court noted in its February 6, 1998 Order that in determining plaintiff's eligibility on remand, the Plan Administrator was not confined by the evidence then on record, and that the parties were free to offer additional evidence. Indeed, during the February 6 hearing on this matter, the Court suggested that the Plan Administrator have plaintiff independently examined. Reliance declined to do so, however, and chose rather to accept as valid plaintiff's symptoms for purposes of its claim determination.

during the period in question. Thus, Reliance concluded that she was not "Totally Disabled" within the meaning of the Plan, and hence not entitled to benefits.

Because, there is no genuine issue of disputed fact, and because neither party wishes to present additional evidence, the parties' cross-motions for summary judgment as to Count II, Reliance's denial of plaintiff's claim for benefits, are now ripe for disposition.[16]

## II.

■ Review of an ERISA administrator or fiduciary's decision is generally *de novo*, except where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan. See *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the latter event, decisions are reviewable only for abuse of discretion. *Id.* Thus, as an initial matter, a reviewing court must determine whether the ERISA plan in issue confers discretionary authority on the administrator or the fiduciary, and if so, whether the administrator or fiduciary acted within that discretion. See *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir.1997). In the instant case, there is little doubt that the Plan, and in particular the language requiring submission of "satisfactory proof of Total Disability to [Reliance]" before payment, grants discretionary authority to Reliance to determine entitlement to benefits, and that Reliance's denial of plaintiff's benefits was within that scope. Accordingly, Reliance's denial of plaintiff's request for long-term disability benefits is reviewed for an abuse of discretion.[17]

■ In the typical abuse of discretion case, a fiduciary's decision must be upheld if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." See *Brogan*, 105 F.3d at 161. The essential inquiry then is whether the decision is reasonable, and if so, the fiduciary's decision will not be disturbed, even if the reviewing court would have independently reached a different conclusion. See *Ellis*, 126 F.3d at 232. Yet, this deferential standard must be modified where, as here, the Plan's fiduciary is also the Plan's insurer. *Id.* at 233. Such a conflict of interest, while tolerated by ERISA, must not infect an ERISA fiduciary's duty to act "solely in the interest of the participants and beneficiaries[.]" 29 U.S.C. § 1104(a)(1). To ensure that it does not, the deference ordinarily accorded a fiduciary's decision "will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir.1996) (quoting *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995)). Thus, while Reliance's decision is reviewed for an abuse of discretion, that standard is modified according to a "sliding scale" of additional scrutiny:

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*Ellis*, 126 F.3d at 233.

■ Where, as here, a claim determination must be informed by the subjective evidence concerning a claimant's condition, and professional judgments which are based largely on what the claimant has said, a fiduciary's discretion to deny long-term disability benefits should ordinarily be upheld. Nevertheless, a review of this record points persuasively to the conclusion that in reaching its discretionary determination, Reliance engaged not in the disinterested evaluation ERISA mandates, but in an evaluation that

16. Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

17. The Court reached the same result in a previous case involving the Plan. See Memorandum Order, *McAlpine v. Reliance Standard Life Ins. Co.*, No. 95-223-A (E.D.Va. August 17, 1995).

impermissibly weighed Reliance's own financial interests. This is reflected by the fact that Reliance has consistently failed to confront the central question presented. Thus, Reliance conceded and did not dispute the existence, severity, frequency or duration of plaintiff's persistent symptoms, which included headaches, lightheadedness, and sensitivity to noise, light and motion. Yet, nowhere in any denial letter did Reliance squarely address whether these undisputed severe and persistent symptoms were compatible or incompatible with plaintiff's ability to perform the essential duties of her job as a CPA. Instead, Reliance's denial of benefits is based on (1) unreliable, irrelevant evidence, (2) a misreading of the record, and (3) continued reliance on the lack of "objective medical evidence" as a basis to deny plaintiff's claim. Moreover, the March 17, 1998 denial letter itself reflects an effort by Reliance merely to sift through the voluminous record and extract those excerpts that, it contends, support a denial of plaintiff's claim. Such an exercise represents neither a "deliberate, principled reasoning process," nor a fulfillment of its duty to act "solely in the interest of the participants and beneficiaries[.]" 29 U.S.C. § 1104(a)(1)(A). Thus, while a fiduciary is properly accorded substantial discretion in determining eligibility to benefits, Reliance, in the instant case, abused that discretion.

Reliance begins its denial of benefits with the erroneous factual premise that "[o]n May 26, 1995, Dr. Chalmeta indicated that [plaintiff] could work an eight (8) hour day." Dr. Chalmeta examined plaintiff on May 26, 1995, but significantly, he did not indicate at the time that plaintiff was capable of working an eight-hour day. Rather, on May 1, 1996, in response to an inquiry from Reliance, Dr. Chalmeta indicated, based solely on a single visit one year earlier, that plaintiff could work an eight hour day. Any weight this observation might have had is erased by Dr. Chalmeta's concession that he could not

"comment on [plaintiff's] present symptoms." Accordingly, any reliance on Dr. Chalmeta's observation in this regard is misplaced.[18]

Reliance also appears to rely heavily on evidence that is irrelevant, or of only marginal significance, to the fundamental issue of whether plaintiff's symptoms precluded her from performing the material duties of a CPA at PHP. Specifically, Reliance notes that two physicians, including Dr. Stark, indicated that plaintiff could sit for five to eight hours per day, and could stand, walk, and drive for one to three hours per day. Yet, nowhere does Reliance confront or acknowledge that these routine activities do not constitute plaintiff's essential duties as a CPA. Moreover, plaintiff never suggested that her symptoms precluded the routine activities of sitting, standing, walking or driving. Rather, as is evident from her first submission to Reliance, the essence of plaintiff's claim was that her symptoms precluded, and were aggravated by, the performance of the intellectual requirements of her position. Clearly, plaintiff's ability to sit, or even stand, during a severe headache is a poor gauge for determining her ability to study and review rafts of figures or financial reports, perform calculations, or prepare consolidated financial statements.

Reliance also discounts Dr. Stark's evaluation of plaintiff's functional capacity, suggesting some inconsistency with his earlier assessments. Specifically, Reliance finds conflict between Dr. Stark's opinion of total disability and the May 21, 1996 release he signed, enabling plaintiff to return to work for as many hours per day as "tolerated." Yet, only a misreading of the record supports such a conclusion. Dr. Stark's May 21 release letter to PHP expressed no opinion that plaintiff could, with her symptoms, tolerate a return to PHP's offices. Indeed, Stark's evaluation notes from the same day list plaintiff as "unable to work."[19] The

---

18. Noticeably absent from Reliance's denial letter is any acknowledgment that Dr. Stark and Dr. Casolaro, two physicians who saw plaintiff on a regular basis, answered the same Physical Capabilities Form in May, 1996, and that both indicated that plaintiff could not work an eight-hour day. Reliance's decision to highlight just

the opinion of Dr. Chalmeta is indicative of its self-interested evaluation of the record.

19. Reliance was well aware of the fact that plaintiff had specifically requested that Dr. Stark write the release, and that his notes acknowledged her inability to return to work at the time.

release merely granted permission for a return, in the event that plaintiff was eventually able to do so. And, the record is clear that after October 5, 1995, plaintiff's symptoms never allowed her to return.

Finally, Reliance continues to rely, impermissibly, on the lack of "objective medical evidence" as a bar to plaintiff's claim. It does so by continuing to rely on the assessment of Dr. Shipkin, who, after confirming the validity of plaintiff's symptoms, and the diagnosis of her condition, concluded in a *non-sequitur* that plaintiff was not disabled because "there is no objective data to support disability." At a later date, Dr. Shipkin did provide a one sentence clarification of his conclusion, stating that "[plaintiff's] symptoms appear valid (consistent with the diagnosis of migraine) but do not prevent her from working." Yet, given the absence of any other basis or explanation for this conclusion, the lack of "objective medical evidence" was again central to Dr. Shipkin's finding. Accordingly, Reliance's continued reliance on Dr. Shipkin's pre-remand evaluation was clear error.[20]

Based on the totality of the evidence, it is clear that a reasonable fiduciary or administrator, acting free of Reliance's conflict of interest, would have exercised its discretion to grant plaintiff's claim for benefits. Indeed, the incompatibility between plaintiff's symptoms and her ability to perform the essential functions of her job is most starkly illustrated by the undisputed result of plaintiff's determined, but ultimately unsuccessful, effort to continue working after her accident. The uncontradicted record clearly reflects that working aggravated plaintiff's symptoms, inhibiting her ability to think, and requiring extended breaks to alleviate the pain. Also uncontradicted is that the pain was at times incapacitating, forcing plaintiff to leave work early or to miss several days at a time, during which time virtually no activity was tolerable.[21] In sum, plaintiff's failed attempts to perform the essential duties of her position only confirmed her physical inability to do the job.

Moreover, it is clear that a disinterested decisionmaker, unlike Reliance, would not completely discount the opinion of a treating physician such as Dr. Stark.[22] Dr. Stark, who was not hired in connection with the filing of the claim, accurately diagnosed plaintiff's condition as PTMD. His conclusion that plaintiff could not perform the essential duties of her position was based on numerous examinations conducted over a ten month period. And, his conclusion was empirically supported by the results of plaintiff's effort to continue working. Thus, Dr. Stark's opinion provided reliable, compelling evidence of plaintiff's disability which a rational fiduciary would not have ignored or discounted.

In sum, a rational fiduciary, acting without a conflict of interest, would have awarded plaintiff her long-term disability benefits. And, it is clear that Reliance put its own financial interest above its fiduciary duty to plaintiff in deciding otherwise.

## III.

For the reasons here stated, Reliance abused its discretion in denying plaintiff's

---

Reliance on the release as rebutting plaintiff's claim of disability offers yet another example of Reliance's self-interested assessment in this case.

**20.** Reliance also appeared to give some weight to Dr. Shipkin's opinion that plaintiff's "prognosis for recovery is reasonably good," even after the Court noted, at oral argument, a flaw with that optimistic assessment. Specifically, Dr. Shipkin's opinion that plaintiff's condition would gradually improve was based on the fact that such symptoms usually resolve in most patients, if at all, within three to six months. Yet, Shipkin's evaluation was made over eighteen months after plaintiff's persistent symptoms had commenced, a fact not accounted for in his report. And, in any event, the record reveals, and Reliance does not dispute, that plaintiff's symptoms persisted and her condition did not improve, contrary to Dr. Shipkin's forecast.

**21.** Moreover, as is clear from the record, the fact that plaintiff's symptoms were intermittent, incapacitating one day while tolerable the next, is fully consistent with a diagnosis of PTMD. Notably, Reliance declined to consider the literature on PTMD provided by plaintiff, noting that "this information is not specifically about [plaintiff]."

**22.** Indeed, in other contexts, the Fourth Circuit has recognized that the opinion of a treating physician is entitled to considerable weight. *See, e.g., Grizzle v. Pickands Mather & Co.*, 994 F.2d 1093, 1097 (4th Cir.1993).

claim for long-term disability benefits under the Plan. Accordingly, plaintiff's motion for summary judgment must be granted as to Count II of the complaint, and Reliance's cross motion for summary judgment must be denied.

An appropriate Order shall enter.