Robert **RANSON**, Plaintiff,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA Defendant.**

**No. CIV.A. 02–836–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 10, 2003.

Benjamin Weaver Glass, III, Benjamin W. Glass, III & Associates, Fairfax, VA, for Plaintiffs.

1. 29 U.S.C. §§ 1001, *et seq.*

2. The facts recited here are derived from the administrative record before UNUM when it

John Curtis Lynch, Troutman Sanders L.L.P., Norfolk, VA, for Defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this Employee Retirement Income Security Act of 1974 ("ERISA") [1] action, plaintiff, a former public relations executive who suffers from neurocardiogenic syncope, seeks review of the denial of his claim for long-term disability benefits under his employment benefit plan by defendant, UNUM Life Insurance Company of America ("UNUM"), the plan administrator and plan insurer.

### I. [2]

Plaintiff, Robert Ranson, now fifty-one years old, was a public relations executive at Arnold Worldwide ("Arnold") from 1997 until his resignation on January 15, 2001. Arnold is a national advertising agency, headquartered in Boston, with offices in Washington, D.C., New York City, and St. Louis. Its clients include Royal Carribean, Volkswagen, Jack Daniel's and Fidelity Investment. At Arnold, Ranson's job title was Senior Vice President, Public Relations Group Director. In this capacity, Ranson supervised twenty employees in the public relations group, and was responsible for business development and client relationships. These responsibilities involved strategic planning and crisis management, and required frequent travel, often weekly, to meet with key clients.

Ranson participated in Arnold's group disability insurance plan ("Plan"), an em-

made its decision to deny long-term disability benefits to Ranson.

ployee welfare benefit plan governed by ERISA, and funded by UNUM. Pursuant to the terms of the Plan, covered employees are entitled to receive short-term and long-term disability benefits, provided that the insured meets the Plan's definitions for those disability conditions.

In Summer 1999, Ranson began to experience significant fainting episodes. He experienced these episodes at work, in some instances when he stood up to make a presentation to clients, and on other occasions in elevators. He also experienced fainting episodes while exercising. Concerned about these episodes, Ranson consulted his primary care physician, Dr. James Cleveland, a board-certified internist, who in turn referred him to Dr. Larry Jackson, a board-certified cardiologist, who suspected that Ranson suffered from neurocardiogenic syncope. Dr. Jackson, a specialist in this condition, conducted the "Tilt Table test," [3] which confirmed the diagnosis of neurocardiogenic syncope.[4] As a result of this diagnosis, Ranson had a pacemaker implanted on October 15, 1999, and in mid-November 1999, he returned to work on a modified schedule, approximately 20 to 25 hours per week.

By January 2000, Ranson had increased his work schedule to approximately 35 to 40 hours per week. Between January and April 2000, Ranson reported no syncope episodes, but complained of frequent and severe headaches, a symptom often associated with neurocardiogenic syncope. During this time, he attempted to reduce his stress level at work by taking Fridays off, avoiding stressful situations, and practicing yoga twice a day.

Nonetheless, Ranson's health continued to fluctuate. In April 2000, he again experienced medical difficulties, including sleeping problems, dizziness, and headaches due to blood vessel dilation. However, at his next doctor's appointment on June 27, 2000, Dr. Jackson concluded that Ranson's neurocardiogenic syncope had stabilized, his migraine headaches had diminished, and his overall health had improved. Still, Ranson continued to report episodes of falling, "unsteady feeling," and dizziness. In this regard, he stated that on several occasions, he felt his knees

---

**3.** In a Tilt Table test, the individual lies on a table, and is tilted in various angles until the individual suffers loss of consciousness. At that point, the test is halted, and the patient revived. An individual not suffering from neurocardiogenic syncope would not lose consciousness or experience possible cardiac arrest.

On October 7, 1999, Dr. Jackson administered the Tilt Table test to Ranson, who suffered loss of consciousness and cardiac arrest within the first five minutes of the test. Dr. Jackson observed that Ranson's reaction was among the most severe he had ever witnessed.

**4.** Neurocardiogenic syncope is a condition in which individuals suffer from fainting episodes, *i.e.* syncope, produced by miscommunication between the heart and the nervous system. An expert on neurocardiogenic syncope, whose article was included in the administrative record, explains the disease mechanism as follows:

Normally a drop in blood pressure would signal your brain to speed up your heart rate to try to get your blood pressure back to normal levels....However, the strong contractions of the ventricle wall cause...a...misinterpret[ation of] what is happening and send a message to your brain that your blood pressure is actually high. In response, the... cardiovascular center...cause[s] your heart rate to slow down.... When blood pressure falls low enough[,] the brain is no longer able to compensate and keep its blood flow constant. Once the oxygen supply to the brain is decreased for a long enough period, you will experience symptoms, including a temporary loss of consciousness—the faint.

Blair P. Grubb and Mary Carole McMann, *The Fainting Phenomenon: Understanding Why People Faint and What Can Be Done About It,* 61–62 (2001).

buckle. Still, he suffered no actual syncope episodes between April 2000 and June 2000.

In Fall 2000, Ranson reported a significant deterioration in his health. At his November 21, 2000 appointment with Dr. Jackson, Ranson reported the return of frequent migraine headaches, one syncope episode at work, and difficulty concentrating for more than one or two hours at a time. On some occasions, he suffered from blurred vision, resulting in an inability to drive home or to client meetings.

At this point, Dr. Cleveland encouraged him to consider retirement to reduce the stress in his life. Dr. Jackson concurred in that recommendation. Both doctors believed that Ranson could not control the syncope episodes and its associated symptoms, unless he removed as much physical and emotional stress from his life as possible. As a result of his doctors' recommendations, Ranson left his position at Arnold on January 15, 2001, but sought and planned to return to work on a modified schedule, if possible. Ranson's plans notwithstanding, by February 8, 2001, Ranson's position had been filled, and on April 15, 2001, Ranson was officially terminated by Arnold.

When he left, on January 15, 2001, Ranson submitted an application for short-term disability. In connection with this claim, both Dr. Cleveland and Dr. Jackson submitted "attending physician's statements" ("APS"). In Dr. Cleveland's APS, he recommended that Ranson "should not engage in mentally stressful work," and "could not...do heavy lifting or straining." Dr. Cleveland recommended that Ranson "stop working for 90–120 days to improve his condition," and that while his prognosis was "good-with reduced stress," his recovery date was "unknown at this time." In Dr. Jackson's APS, he recommended that Ranson "should not...meet stresses of current job," and "could not...accomplish decision making...." Nonetheless, Dr. Jackson described Ranson's prognosis as "good for [the] long term," with a recovery expected in six to twelve months. On February 2, 2001, UNUM approved Ranson's request for short-term disability benefits, and informed Ranson that his request for long-term disability was still under review. On February 21, 2001, UNUM sent Ransom a letter informing him that his request for long-term disability had been pre-approved, provided he continued to meet the Plan's definition of disability; Ranson was to begin receiving benefits on April 15, 2001.

In Winter 2001, following his departure from Arnold, Ranson adopted a daily routine that involved paperwork, household chores, light exercise, and rest.[5] Ranson

---

5. His self-reported schedule, as of July 24, 2001, which UNUM found significant and illustrative of Ranson's lack of long-term disability, was as follows:

 1. Ranson awakened between 6:00–7:00 A.M.

 2. Ranson practiced light yoga and meditation for 30 minutes. Drs. Cleveland and Jackson recommended that Ranson practice yoga as a method to control the frequency and duration of the syncope episodes.

 3. Ranson ate breakfast and showered.

 4. Ranson did approximately two to two and a half hours of paperwork, including medial and insurance documents, household bills, and emailed his friends and colleagues. Ranson also worked on his computer graphics hobby.

 5. Ranson took a mid-morning break

 6. Ranson did household errands in his neighborhood, which typically included trips to the grocery store, pharmacy, and doctor's appointments. These trips took approximately one hour.

 7. If Ranson did not have errands to run or doctors' appointments scheduled, he walked to the local pool, and went swimming. In general, Ranson swam for

informed UNUM of this schedule in an extensive interview with a UNUM representative on February 8, 2001. Ranson's schedule reflected his attempt to "pace himself" by performing only intellectual tasks and physical exercise for limited periods of time. While Ranson continued to drive short distances (thirty minutes or less), he refrained from driving entirely when he felt dizzy or sensed that a syncope episode might occur. Ranson reported a significant decline in syncope episodes in late February 2001, which he attributed to the removal of stress from his life; his migraine headaches, however, continued to occur.[6] At his May 24, 2001 appointment with Dr. Jackson, Ranson reported continued fatigue and exhaustion, especially when his exercise was too vigorous. By Summer 2001, Ranson reported a rise in the number of syncope episodes, which include blackouts and prolonged periods of dizziness.

. On May 11, 2001, UNUM advised Ranson that he had not been approved for long-term disability benefits, and requested that Ranson's doctors provide UNUM with additional medical information. In response, both Dr. Cleveland and Dr. Jackson submitted supplemental statements to UNUM. Dr. Cleveland's June 1, 2001 supplemental statement advised that Ranson "should not engage in any activity that increases mental stress or requires prolonged (...[more than] 15 minutes) sitting or standing (prone position is allowed)." Furthermore, Dr. Cleveland's statement advised that Ranson "cannot engage in stressful (mental or physical) activities or activity requiring...[more than] 15 minutes standing or sitting." On June 6, 2001, Dr. Cleveland also submitted an Estimated Functional Abilities Form, advising that Ranson "cannot stand in one position, stationary, or sit in one position, stationary, due to neurocardiogenic syncope." Dr. Cleveland also noted on the form that Ranson could perform "zero hours" of "sedentary activity," defined as sitting for six to eight hours with occasional walking or standing, or "light activity," defined as standing for six to eight hours.

Dr. Jackson's June 4, 2001 supplemental statement advised that Ranson "cannot safely and without a threat to his health perform the duties of his previous job." Further, Dr. Jackson's statement also advised that Ranson "cannot stand, concentrate, meet deadlines, or [undertake] stressful activities required in his previous job," and that "prolonged standing [would] lead...to syncope (loss of consciousness)." Like Dr. Cleveland, Dr. Jackson stated that Ranson could perform "zero hours" of "sedentary" or "light" activity.

Ranson's claim for long-term disability benefits was reviewed by a UNUM nurse

twenty to thirty minutes, one to two times per week.
8. Ranson ate lunch.
9. Ranson slept about two to two and a half hours, which he regarded as essential to preventing headaches and dizziness the following day.
10. Ranson practiced light yoga and meditation for 30 to 40 minutes.
11. Ranson prepared dinner for his children, and then ate dinner.
12. After dinner, Ranson read, watched TV, or engaged in other leisure activities.
13. One evening a week at Tysons Corner, Ranson attended a three-hour Spanish class. Ranson reported that he was not always able to attend the entire class without encountering vision problems and feeling light-headed.
14. Ranson retired for the evening at around 9:00 P.M., and fell asleep by 10:30 P.M.

6. On February 1, 2001, Ranson consulted a neurologist, Dr. Ruben Cintron, who prescribed medication for his migraines. Thereafter, Ranson reported, his migraines diminished.

and an in-house physician, Dr. Thomas Reeder. Following this internal review, on August 3, 2001, UNUM denied Ranson's long-term disability claim because "there was no medical information that support restrictions and limitations severe enough to preclude work capacity." First, UNUM disputed that Ranson's January 15, 2001 resignation was medically necessary because he had not suffered a significant number of syncope episodes prior to that date. Specifically, UNUM stated that Ranson reported no syncope, or near syncope, episodes to his doctors on March 30, 2000, June 27, 2000, and July 13, 2000, and reported only one syncope episode prior to the November 21, 2000 visit. Moreover, Ranson did not report any falls, injuries, or incontinence during this period, prior to his resignation. Thus, UNUM concluded that Ranson's decision to leave his position on January 15, 2001 was nothing more than a "personal choice to cut off stress" in his life.[7]

Next UNUM, in its letter denying long-term benefits, stated that Ranson's daily activities were inconsistent with his doctors' restrictions and limitations. UNUM observed that Ranson "[sat] at [his] computer and perform[ed] paperwork, author[ed] documents of great length, [took] classes, perform[ed] household chores and exercise," all of which, in UNUM's view, "is inconsistent with [Ranson's] claimed lack of work capacity." Finally, UNUM stated that there was "no objectifiable [sic]

evidence to validate the severity of symptoms reported," and, in fact, the evidence was to the contrary. UNUM noted that Ranson's condition appeared to improve following the pacemaker insertion, and that he had not reported any evidence of falls or injures resulting from his "blackout spells." Furthermore, Ranson's headaches appeared to respond well to the prescribed medication. In UNUM's view, the absence of trials of alternative headache medication was inconsistent with Ranson's claim of significant impairment from headaches. Moreover, Ranson continued to drive without a restricted drivers license, which, in UNUM's view, was inconsistent with his self-reported "spells" and doctors' restrictions. Finally, while Ransom's doctors advised the avoidance of stress, UNUM noted the absence of aggressive stress management, including medication. Significantly, while the record includes a February 9, 2001 entry briefly sketching an outline of Ranson's duties, UNUM's August 3, 2001 denial letter neither described Ranson's job in detail, nor did it explicitly evaluate whether Ranson's neurocardiogenic syncope would limit him in performing any of these duties.[8]

On October 30, 2001, Ranson appealed UNUM's decision, submitting a detailed letter in response to UNUM's denial letter. Ranson also provided a list of cardiology experts who specialize in neurocardiogenic syncope, as well as the titles of

---

7. UNUM emphasized Ranson's statement to UNUM that because he had not anticipated UNUM's denial of long-term benefits, he was forced to find a new job given that his position at Arnold had been filled. This, according to UNUM, supported its position that Ranson's cessation of work was a personal choice, not caused by his neurocardiogenic syncope.

8. This February 9, 2001 entry stated as follows:

> Based on the information provided on the job description, it appears that Mr. Ranson is a Public Relations Manager. According to the OOH (Occupational Outlook Handbook, 2000–2001) Public Relations Managers are required to do a substantial amount of travel. They work under pressure when schedules change and problems arise, but deadlines and goals must still be met. 40% of advertising, marking, and public relations managers work 50 hours or more a week.

two medical articles regarding this condition.[9] Additionally, Ranson submitted a letter, dated October 1, 2001, from Dr. Cleveland, which Dr. Jackson also signed. In this letter, Dr. Cleveland recounted Ranson's medical history, concluding with his diagnosis of neurocardiogenic syncope and migraine headache syndrome. Dr. Cleveland reiterated his assertion that Ranson's condition is chronic, and irreversible, and importantly, that his symptoms can be controlled only through daily medication, rest, and avoidance of stress. Accordingly, he recommended that Ranson cease work in an attempt to improve his symptoms of recurrent headaches, fatigue, and weakness.

Nonetheless, on November 21, 2001, Ranson's appeal was denied. On January 7, 2002, Ranson's file was reviewed by Dr. George DiDonna, a UNUM cardiology consultant. Dr. DiDonna did not dispute the diagnosis of neurocardiogenic syncope, but contended that Ranson's symptoms, particularly his migraine headaches, had been, and would continue to be, controlled by medications. Moreover, Dr. DiDonna noted that Ranson's medication dosages are not maximal, and that he has not sought the advice of a psychiatrist to deal with his work-related stress. Accordingly, on January 10, 2002, Ranson's appeal was denied again.

On March 27, 2002, Dr. Jackson wrote a letter to UNUM, which restated his conclusion that Ranson's neurocardiogenic syncope has "severely and permanently" impaired Ranson's ability to concentrate, focus, maintain short-term memory, manage "intellectual multi-tasking," or maintain himself in an upright position for short periods of time. Furthermore, the effect of long-term stress on individuals like Ranson is "maladaptive acceleration of the usual pace of programmed neuronal cell death," which would result in "some degree of permanent impairment of cerebral function." Thus, asserted Dr. Jackson, Ranson's intellectual capacity to perform his previous job was no longer available, and might be further compromised if he continued in his job at Arnold. On April 23, 2002, Dr. DiDonna reviewed Dr. Jackson's letter and other additional medical records, but reached the same conclusion: Ranson's neurocardiogenic syncope was controlled by medication, and his self-reported level of activity was inconsistent with his claimed level of impairment. Dr. DiDonna again questioned the lack of psychiatric referral for stress management. Accordingly, on May 3, 2002, UNUM upheld its initial denial of Ranson's claim for benefits.

On June 7, 2002, Ranson filed this action seeking review of UNUM's denial of benefits. On October 10, 2002, Ranson filed a "Brief for Benefits," and on November 8, 2002, UNUM filed its motion for summary judgment, to which Ranson has responded. Because there are no genuine issues of disputed fact, UNUM's denial of Ranson's claim for benefits is now ripe for disposition. *See* Rule 56, Fed.R.Civ.P.

## II.

The framework for review of the denial of benefits under ERISA is well-settled. Benefit determinations by Plan administrators are typically reviewed *de novo*, except where, as here, the benefit plan grants the administrator discretionary authority to determine eligibility for disability benefits.[10] *See Firestone Tire*

---

9. The two articles cited by Ranson are: "General Information Brochure on Neurally Mediated Hypotension and Its Treatment," published by The Johns Hopkins Hospital; and "Unexplained Fainting and Syncope," published by Medtronic, Inc.

10. The Plan states: "When making a benefit determination under the [Plan], UNUM has

*and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In these circumstances, the Plan administrator's determination is reviewable only for abuse of discretion. *See id.* Under this "deferential standard," an administrator's decision "will not be disturbed if it is reasonable, even if this court would have come to a different conclusion." *Ellis v. Metropolitan Life Insurance Co.,* 126 F.3d 228, 232 (4th Cir.1997). Typically, where the administrator's decision is the "result of a deliberate, principled reasoning process and . . . is supported by substantial evidence," a reviewing court must uphold the decision. *See Pappas v. Reliance Standard Life Insurance Co.,* 20 F.Supp.2d 923, 929 (E.D.Va.1998).

 Yet a further refinement of this review standard is applicable here. Where there is a conflict of interest resulting from the fact that the Plan's administrator is also the Plan's insurer, the court must ensure that this conflict does not infect the administrator's decision-making process. The Fourth Circuit has characterized this review standard as a "sliding scale:"

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation or benefit eligibility or

discretionary authority to determine [a claimant's] eligibility for benefits, and to interpret the terms and provisions of the policy."

**11.** *Compare Sheppard & Enoch Pratt Hospital, Inc. v. Travelers Ins. Co.,* 32 F.3d 120, 126 (4th Cir.1994) (holding that the conflict of interest principle does not apply when an employee benefit plan has a third-party plan administrator who is not the insurer of the plan, and accordingly, does not have a financial stake in its benefit determinations). In these circumstances, more deference is appropriately given to the plan administrator's determinations than would be appropriate in cases involving an administrator's determination under plans like those in *Ellis* and the instant case.

other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it.

*See Ellis,* 126 F.3d at 233.[11] Accordingly, a court must "review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Id.* (citing *Bedrick v. Travelers Insurance Co.,* 93 F.3d 149, 152 (4th Cir.1996)). To be clear, the administrator's decision is still reviewed for an abuse of discretion; however, "this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Id.*

Guided by these principles, the review of UNUM's benefits denial decision appropriately begins with a precise and detailed listing of the essential duties of Ranson's position at Arnold. *See Gallagher v. Reliance Standard Life Ins.,* 305 F.3d 264, 271 (4th Cir.2002) (holding that the plan administrator must begin the disability determination with a precise and detailed description of the claimant's job duties).[12]

**12.** In *Gallagher v. Reliance Standard Life Ins.,* under the relevant plan, an employee is disabled when he "cannot perform each and every material duty of his/her regular occupation." *Gallagher,* 305 F.3d at 270. The Fourth Circuit stated that if the plan does not define "regular occupation," the fiduciary "must adopt an appropriate description of the claimant's occupation." *Id.* 305 F.3d at 271. While the analysis in *Gallagher* centers mostly on whether the job description adopted by the plan in that case accurately reflected the employee's actual job duties, *Gallagher* nonetheless stands for the sensible proposition that the starting point of the analysis must be a precise definition of the claimant's job duties to enable the administrator to analyze properly whether the claimant's medical condition

This is so because the Plan definition for disability is stated in terms of the claimant's occupation. Here, the Plan specifically provides for an award of disability benefits if UNUM, as the Plan administrator, determines that the beneficiary is *"limited from performing the material and substantial duties* of [his] *regular occupation* due to [his] *sickness* or *injury."* [13] Thus, UNUM's disability determination should properly have commenced with a listing of the "material and substantial duties" of Ranson's "regular occupation," *i.e.*, Arnold's Senior Vice President, Public Relations Group Director, so that it might then make a "deliberate [and] principled" analysis and judgment as to whether he was limited by his neurocardiogenic syncope from performing each of these occupational duties. *See id.; Pappas*, 20 F.Supp.2d at 929.

Yet, in the circumstances, it does not appear on this record that UNUM has done this. While UNUM's February 9, 2001 record entry contained an insufficiently detailed summary of Ranson's occupation as a public relations executive, none of UNUM's denial letters include either a sufficiently precise and detailed listing of Ranson's occupational duties or the requisite deliberate and principled analysis of Ranson's ability to perform those duties. Instead, UNUM has focused its analysis on Ranson's self-reported daily activities, his lack of frequent syncope episodes prior to his resignation, his effective migraine medication, and his failure to seek psychi-

atric help for stress management. To be sure, some or all of these factors may have some relevance in the course of an appropriate analysis. But in the absence of such an analysis, they may not simply be recited and relied on as dispositive. Thus, while UNUM asserts that Ranson's daily activities of paperwork, light exercise, and household errands exceeded his doctors' restrictions and limitations, UNUM has failed to analyze precisely whether these daily activities indicate that he is able to perform the "material and substantial duties" of his regular occupation.[14] Likewise, UNUM's assertions that Ranson's medications are not maximal and his failure to see a psychiatrist for stress management, while possibly relevant, do not directly address the central inquiry, namely whether Ranson could perform the "material and substantial duties" of his regular occupation. And finally, the fact that Ranson felt the necessity to seek a new job when his disability claim failed is not conclusive evidence that he is not disabled under the Plan. The record does not disclose whether he obtained a new job, or the duties of this new job. It is therefore impossible to ascertain whether his performance of the new job, if he obtained one, means that he is not "limited from performing the material and substantial duties of [his] regular occupation." Indeed, the new job's duties may be very different from his duties at Arnold, and entirely consistent with the limitations on Ranson's activities owing to his neurocar-

---

limited the claimant's ability to perform each of the job duties. *Id.* 305 F.3d at 271–73.

**13.** The Plan further defines disability as when the claimant "[has]...a 20% or more loss in [his] *indexed monthly earnings* due to the same sickness or injury." Moreover, UNUM's policy provides that benefit payments will end, "when [he is] able to work in [his] regular occupation on a part-time basis but [he] choose[s] not to."

**14.** Arguably, Ranson's current daily activities are unrelated or different from the fast-paced and high-stress environment of his former position at Arnold. Had UNUM conducted a careful analysis of Ranson's regular occupation, the comparison would more clearly reveal whether Ranson is limited in, or capable of, performing the "material and substantial duties" of his previous occupation.

diogenic syncope. Put another way, the fact that Ranson can perform another job does not necessarily contradict the finding that he is disabled under the Plan.

In sum, the current record is inadequate to assess whether UNUM appropriately exercised its limited discretion in denying Ranson's application for disability benefits. Accordingly, it is appropriate to remand this matter to UNUM to undertake the required analysis: UNUM should detail each "material and substantial" duty of Ranson's position at Arnold, and then "conduct a deliberate, principled, reasoning process" to determine whether the fact that he suffers from neurocardiogenic syncope limits his ability to perform each of these activities.

An appropriate Order will issue.