**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 06-2189**

_____

JAMES A. WHITLEY,

                                        Plaintiff - Appellant,

        versus

HARTFORD LIFE & ACCIDENT INSURANCE COMPANY,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Frank D. Whitney, District Judge. (3:04-cv-00129)

_____

Argued: September 26, 2007          Decided: January 29, 2008

_____

Before MICHAEL, GREGORY, and DUNCAN, Circuit Judges.

_____

Reversed and remanded with instructions by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Michael and Judge Duncan joined.

_____

**ARGUED:** J. Lynn Bishop, Charlotte, North Carolina, for Appellant. Katherine Thompson Lange, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellee. **ON BRIEF:** Debbie W. Harden, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Charlotte, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

This lawsuit involves the termination of long-term disability benefits under a group plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). James A. Whitley ("Whitley") claims that Hartford Life & Accident Insurance Company ("Hartford") abused its discretion in wrongfully terminating his benefits. After careful consideration, we reverse the district court and award Whitley benefits.

I.

Whitley worked as a Wal-Mart truck driver for approximately ten years. On September 4, 1998, Whitley filed a claim with Hartford for long-term disability benefits, stating he could no longer work as a truck driver because of lower back pain. With his claim, he submitted evidence of degenerative disc disease and a bulging disc in his lumbar spine, limiting him to light work and no lifting over 35 to 40 pounds.

Hartford denied the claim, based on the presupposition that driving trucks for Wal-Mart constituted light work, requiring only the ability to lift 10 pounds. Whitley appealed and presented evidence that Wal-Mart truck drivers must occasionally lift and carry up to 40 pounds and, at times, lift up to 80 pounds. Hartford obtained additional treatment records and ordered a

2

functional capacity evaluation of Whitley. Hartford eventually approved Whitley's benefits based on that evaluation.

Hartford then conducted a vocational assessment to determine whether Whitley qualified for an alternate job. The assessment indicated there were no alternative available jobs for someone with Whitley's education, work experience, and medical restrictions that would pay enough to qualify as suitable work. On July 6, 1999, Hartford informed Whitley that he met the policy definition of "Total Disability" and that he would continue to qualify for benefits. (J.A. 117.) The letter also stated that "[p]eriodically [Hartford would] provide [Whitley] with supplementary claim forms so that [he could] furnish [them] with continued proof of Total Disability." Id. Whitley received benefits from Hartford from September 1998 to February 2003. On March 6, 2003, Hartford sent Whitley a letter terminating his benefits.

Hartford began investigating the validity of Whitley's claim after their fraud department received an anonymous letter in late March 2001. Following the receipt of the letter, Hartford began surveillance of Whitley in late April 2001. The surveillance revealed Whitley's doing a number of activities, including standing, sitting, driving, visiting his chiropractor, going to a gym, and riding his tractor. (See Ex. Vols. 1 & 2.)

Additionally, as part of its investigation, Hartford had Whitley submit an Attending Physician's Statement of Continuing

3

Disability filled out by his chiropractor, Dr. George Ring. The assessment indicated that Whitley had lower back pain with radiation down his left leg and that his pain prevented him from sitting more than one hour and from lifting heavy weights, although he could manage conveniently placed medium weights. In late July 2001, a Hartford claim investigator interviewed Whitley, who reported that he could, and did, do a number of activities.

In November 2001, Hartford requested another functional capacity evaluation. That evaluation concluded that Whitley could sit for thirty minutes to an hour, provided he could change positions, and could possibly do some light lifting. Hartford conducted additional surveillance in late November.

In December 2001, Hartford employed a nurse to review the evaluation.[1] She concluded that the functional capacity evaluation appeared valid and recommended referring Whitley's file for possible employability analysis. The employability analysis, dated December 13, 2001, found that none of the occupations Whitley could perform, given his education, work experience, and physical limitations, met or exceeded the required earning potential.

In June 2002, Hartford resumed surveillance of Whitley. Also in June, an ergonomic job analysis report was prepared that

---

[1]Whitley scored a 7 out of 16 on the Waddell questionnaire associated with the 2001 functional capacity evaluation. According to Hartford's brief, "Waddell's signs of positive for 3 or more are strongly suggestive of symptom magnification." (Appellee's Br. 12 n.1 (emphasis added).)

4

indicated Wal-Mart truck drivers must sit for six to eight hours a day and at two to four hours at a time. Other job requirements included pushing and pulling with various amounts of force.

In October 2002, Hartford requested an updated statement from Whitley's attending physician. Because Dr. Ring, who was treating him at the time, was unwilling to certify Whitley's long-term disability, Whitley went to see Dr. Abda, whom he had not seen since January 8, 1999. Dr. Abda concluded that Whitley could stand for 45 minutes, walk for 30 minutes, sit for 30 minutes and push or pull 10 pounds. X-rays conducted that day revealed increased narrowing in Whitley's vertebrae.[2]

In January 2003, Hartford had Dr. Elkins conduct an independent medical examination. Dr. Elkins diagnosed Whitley with degenerative disc disease at L4-5 and stated that Whitley should be able to lift 75 pounds occasionally and 50 pounds frequently.

In February 2003, the investigator contacted Dr. Abda by letter, informing her that "[u]nlike typical truck-driver occupational requirements, Wal-Mart's truck-driver position is considered 'light work' as the drivers do not load, unload, or otherwise engage in any material handling." (J.A. 154.)

On March 6, 2003, Hartford sent Whitley a detailed letter terminating his benefits, explaining that he no longer met the

---

[2]The x-rays revealed a narrowing in the lumbosacral joint or L5-S1; previous narrowing had only been observed in his L4-5 space.

policy's definition of disabled. Whitley appealed with support from an independent medical examination by Dr. Shaffer, as well as other documents. Dr. Shaffer's report concluded, "[i]t is my medical opinion that this patient is totally disabled from <u>returning to long distance truck driving</u>." (J.A. 559 (emphasis added).) When asked to reconcile that conclusion with Whitley's activities depicted on the surveillance tape, Dr. Shaffer wrote: "I see nothing in these films which would alter my opinions as expressed in my report of 9/16/03 to you." (J.A. 561.)

Dr. Turner of the University Disability Consortium reviewed Whitley's 2001 interview and the ergonomic job analysis for Hartford. In his report, Dr. Turner indicated that if Whitley could lift 30-40 pounds, there is no reason he could not push or pull 60-80 pounds. Additionally, Dr. Turner found Dr. Schaffer's report inconsistent and the functional capacity evaluation administered by Hartford unreliable. Based on Dr. Elkins' finding that Whitley could lift 50 pounds, Dr. Turner concluded Whitley could push or pull 100 pounds and that Whitley should be restricted to light work. In the course of his assessment, Dr. Turner performed no firsthand evaluations of Whitley's condition.

On October 29, 2003, Dr. Turner sent a letter to Dr. Abda that read: "[y]ou also feel that [Whitley] should have no problem sitting 2-4 hours per day at a time as is required by his job. It is your opinion that he should be able to lift and carry 35 pounds

6

occasionally and push/pull if necessary up to 100 pounds." (J.A. 329.) Dr. Abda signed the letter.[3] Based on these opinions, Hartford determined that Whitley no longer qualified for benefits.

Pursuant to ERISA, Whitley filed suit in March 2004. Counsel for both parties filed cross-motions for summary judgment. On September 25, 2006, the United States District Court for the Western District of North Carolina ("district court") entered an oral ruling on both motions for summary judgment. The district court found that the policy granted Hartford the discretion and the authority to determine benefits eligibility and to interpret the policy terms. Using a modified abuse of discretion standard in reviewing Hartford's decision, the district court found (1) Whitley did not meet his burden of proof because he failed to demonstrate that he met the requirements of "total disability" under the policy, (2) the defendant presented substantial evidence that Whitley could work as a truck driver, (3) which Whitley failed to rebut. Based on these findings, the district court concluded that substantial evidence demonstrated that Hartford's decision to deny benefits was reasonable, and that no evidence indicated that Hartford abused its discretion in denying Whitley's total

---

[3]Before signing the letter, Dr. Abda removed sentences stating that she "noted [Whitley's] lawyer tried to put words in [her] mouth" and that she "[did] not note any evidence of impairment, and your conclusion is in [sic] appears capable of performing his own occupation as a truck driver full-time." (J.A. 329.) Dr. Abda replaced the latter with a statement rating Whitley at 25% permanent partial impairment of his spine. Id.

7

disability benefits.  Thus, the district court granted Hartford's motion for summary judgment, and denied Whitley's.  Whitley appealed to this Court.

II.

Generally, this Court reviews a summary judgment denying disability benefits de novo, using the same standards applied by the lower court.  Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997) (citing Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 123 (4th Cir. 1994)).

When the benefit plan gives the administrator discretionary authority in determining eligibility for benefits or construing the terms of the plan, a reviewing court may only reverse the denial of benefits if the administrator abused its discretion.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989); see also Carolina Care Plan, Inc. v. McKenzie, 467 F.3d 383, 386 (4th Cir. 2006) (citing Smith v. Cont'l Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004)).  However, when there is a conflict of interest, the standard is slightly different.  "The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence must be to support

8

it." Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997).

In light of the apparent conflict of interest here, this Court reviews Hartford's decision under the modified abuse of discretion test used for fiduciaries with conflicts of interest. McKenzie, 467 F.3d at 386-87 (internal citations omitted).


III.

We begin by establishing the parameters of Hartford's disability coverage. Under the applicable policy,

> Total Disability or Totally Disabled means that: (1) during the Elimination Period; and (2) for the next 12 months you are prevented by: (a) accidental bodily injury; (b) sickness; (c) Mental Illness; (d) substance abuse; or (e) pregnancy, from performing the essential duties of your occupation, and are under the continuous care of a Physician, and as a result you are earning less than 20% of your Pre-disability Earnings, unless engaged in a program of Rehabilitative Employment approved by us.

(J.A. 60 (emphasis added).) The disability provision goes on to explain that "[a]fter that, you must be so prevented from performing the essential duties of any occupation for which you are qualified by education, training, or experience" and that "'[y]our occupation' includes similar job positions with the Employer which may be offered to you, with a rate of pay 60% or greater of your Indexed Pre-disability Earnings." Id. Hartford agrees to pay disability benefits to claimants until either the date a claimant is no longer disabled, or the date a claimant fails to provide

9

proof of a continuous disability.  Hartford terminated Whitley's benefits based on its assertion that the evidence in support of Whitley's claim did not establish that he continued to meet the policy definition of "total disability."  We now turn to whether that decision was an abuse of Hartford's discretion or unreasonable.

IV.

In general, "the administrator's decision will not be disturbed if it 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Elliott v. Sara Lee Corp., 190 F.3d 601, 605 (4th Cir. 1999) (quoting Brogan, 105 F.3d at 161).  Substantial evidence consists of less than a preponderance but more than a scintilla of relevant evidence that "a reasoning mind would accept as sufficient to support a particular conclusion."  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).  In assessing the reasonableness of a fiduciary's decision, a reviewing court may look to a variety of factors including:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8)

the fiduciary's motives and any conflict of interest it may have.

Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 342-43 (4th Cir. 2000).  In this case, we focus primarily on the sufficiency of the evidence upon which Hartford based its conclusion that Whitley failed to continue to qualify for disability benefits, as well as the reasonableness of Hartford's decision-making process.

In late March 2001, Hartford received the anonymous letter, which sparked the two-year investigation of Whitley's claim.  That letter stated:

> The above referenced person has been collecting disability benefits from your company fraudulently for over 2 years.  He had been talking about retiring for awhile before going out on disability.  He worked for Walmart [sic] as a truck driver.  Before becoming disabled he bought a new GMC truck and said it was his "retirement truck."  I can't remember the exact date he went on disability but I am recalling it as spring [sic] 1998.
>
> Following his "retirement" on disability, he was witnessed crawling around on a barn roof and helping a neighbor build a new barn.  In early 1999 when the eastern part of North Carolina was flooded due to a hurricane, he went with a church group to help rebuild the houses, was gone for 2 weeks and slept on a hard church pew the whole time (I saw this on video).
>
> Every year he goes deer hunting with his son-in-law, Chris Rodriguez and crawls around up in tree stands.  Every spring and summer since his "disability" he has continually driven a tractor, plowed a garden, worked a garden, and driven a riding lawn mower.
>
> During the third week of March, he drove a full size van to Orlando Florida [sic] from North Carolina and back with his family.  Now keep in mind that James is out on permanent disability due to his back.  He can't work at all but it is ironic that he can do other things he wants to [sic].  Within the past year, I have heard him state that he has a good disability policy and he makes more money being disabled than he did working.

11

This irritates me to no end knowing he is doing what he wants to do while I go to work and pay to keep up his disability "retirement." I can't give my name because he knows me very well, but if your company wants to save some money, just watch him for a while.

(J.A. 130.) Following the receipt of the anonymous letter, Hartford ordered a second functional capacity evaluation in November 2001, the results of which ultimately supported Whitley's position. Yet in spite of the two evaluations, the claim investigator assigned to Whitley's case wrote an internal letter in which she stated: "I don't believe these results are accurate given what has been reported to us by an anonymous person concerning Mr. Whitley's activities. . . . It is my suspicion that this clam't is capable of performing his Wal-Mart trucker job which is considered Light and have [sic] the ability to sit for 2 hrs. (minimal lifting)." (J.A. 185 (emphasis added).) In the same correspondence, the claim investigator noted that she was currently employing a registered nurse who had performed functional capacity evaluations herself to review Whitley's second evaluation. That nurse found the results reliable and that Whitley "gave good effort." (J.A. 263.) When the same nurse was again asked for her opinion in April 2002, the claim investigator noted that the nurse "is of the opinion the claimant cannot return to work due to his age and back problem." (J.A. 176.) Five months later, Hartford requested another evaluation from Dr. Abda, the results of which showed further degeneration of Whitley's condition. An x-ray

12

revealed narrowing of Whitley's L5-S1, when previously narrowing had only been observed in the L4-5 space. (J.A. 321.) Thus, all of the objective tests requested by Hartford supported Whitley's continued disability.

Unlike many ERISA cases, which deal primarily with conflicting medical diagnoses,[4] the dispute here does not stem from Whitley's ailment, which is more or less undisputed: doctors on both sides agree that Whitley has a degenerative disc disease at L4-5. Additionally, it is undisputed that the disease has spread. Both sides acknowledge that this problem limits his ability both to sit and to lift. The disagreement is with respect to how severely the undisputed disease impairs Whitley's functioning. Thus, the central issue of this case is not Whitley's diagnosis, but whether, given Whitley's <u>acknowledged</u> physical limitations, he proved he could not perform the essential duties of his former occupation. We, therefore, first address exactly what constitutes the essential duties of a Wal-Mart truck driver.

Wal-Mart's Ergonomic Job Analysis Report specifically states that opening the trailer door involves the ergonomic risk factors

---

[4]In <u>Ellis</u>, 126 F.3d at 233, we held that an administrator acted reasonably in denying a claim because, despite the opinion of several doctors that she was disabled, the insurance company had "substantial evidence" that her doctors did not agree on the proper diagnosis, and three independent medical reports "concluded that there was no conclusive diagnosis of Ellis's condition." However, unlike in <u>Ellis</u>, here the doctors concurred in Whitley's diagnosis.

of "force, reach, awkward posture (shoulder flexion, lateral back flexion)." (J.A. 528.) The report indicates that beyond the sitting and occasionally lifting, being a Wal-Mart truck driver requires pushing and pulling:

> The force required to release the tandem pin [at the back of the truck] is estimated to be 30-35 lbs. under optimal conditions. At times (occasionally), 50-65 lbs. of force may be required to release the tandem pin, and on occasion (rarely) up to 75 lbs. of force may be required. Force required to adjust landing gear, dollying up, is estimated to be 50-60 lbs. for an empty trailer and and [sic] 120 lbs. with a loaded trailer. Varying amounts of force are required to open the roll-up doors on the trailers, depending upon the condition of the trailer and the door.

(J.A. 519.) Accordingly, the report summarizes the exertion required for the job as follows:

> The physical demand of this job, overall, can be classified as "sedentary to light". The driving component, in itself, requires mental alertness with some physical demand required to operate controls, steering, etc. This physical demand is associated with the ability to sit for long periods (sedentary) and the ability to operate driving controls, including steering, accelerator, brake, clutch, gear changes, radio, and various dashboard controls (light). The driver's job requires no material handling in terms of loading and unloading freight. However, more taxing physical demands do occur intermittently. More taxing demands occur as the driver climbs in and out of the cab, stoops/crouches during safety checks, dollies the trailer, adjusts tandems, and opens and closes the trailer door. These intermittent (and for the most part infrequent) tasks, individually, fall into classification levels of "medium", "heavy" and "very heavy". Assistance with the more taxing physical demands is available while the truck is in the yard. No assistance is available to drivers after they leave the yard and they must perform these tasks on the road independently as necessary.

14

(J.A. 529 (emphasis added).) Thus, even if a person could perform most of the job's "light" essential duties, he or she might have difficulty with more taxing physical demands that occur intermittently. Based on the physical requirements of a Wal-Mart truck driver outlined in the Ergonomic Job Analysis Report, we conclude that, although the more strenuous actions of releasing the tandem pin and adjusting the landing gear do not take up a majority of a Wal-Mart truck driver's time on the job, they are nonetheless essential duties for the purposes of assessing disability.

We now examine Hartford's conclusion that Whitley, given his undisputed medical condition, could perform all the essential functions of a Wal-Mart truck driver. In particular, we assess the evidence regarding whether Whitley could sit two to four hours at a time and push and pull with 120 pounds of force.

Hartford looks to the medical opinion of two doctors, Dr. Turner and Dr. Abda, in support of the reasonableness of its decision to terminate Whitley's benefits. However, neither doctor presented reliable, persuasive evidence that Whitley could perform all the essential duties of Wal-Mart trucker driver outlined in Wal-Mart's Ergonomic Job Analysis Report.

Both functional capacity evaluations, as well as Dr. Abda's 2002 analysis, indicated that Whitley could not sit for the two to four hours at a time required by his former job. To refute these medical results, Hartford presented a letter signed by Dr. Abda,

15

concluding that Whitley could sit for the required amount of time. However, the letter does only that: it <u>concludes</u> that Whitley is capable of sitting two to four hours but without any justification whatsoever. In fact, the letter is simply a series of conclusions, at which Dr. Turner arrived, with which Dr. Abda indicates she agrees absent any of her own independent medical evaluation. Dr. Turner's own report included no analysis, beyond his observation of the surveillance video, and such casual, non-medical statements as "[n]o one who has any significant back pain would intentionally ride a riding lawnmower." (J.A. 567.) He then concluded "there is no reason that [Whitley] could not sit for two to four hours at a time for a total of eight hours a day, as noted in his own job description." (J.A. 568.) Although, Dr. Turner and Dr. Abda made conclusory statements regarding the length of time Whitley could sit, they provided no explanation of the medical foundation used to arrive at these conclusions.

Moreover, there is absolutely no evidence in the administrative record that Whitley could exert the 120 pounds of force that may, albeit rarely, be required of a Wal-Mart truck driver. Although both Dr. Abda and Dr. Turner agreed that Whitley could push or pull up to 100 pounds, no medical professional expressed the view that Whitley could push or pull 120 pounds, the amount of force necessary to "dolly up" a loaded trailer, according to the Ergonomic Job Analysis Report. (J.A. 519.)

16

In determining disability under Hartford's policy, the inquiry is not whether a claimant can perform <u>most</u> of the essential duties of the job: it is whether the claimant is prevented from "performing the essential duties of [his] occupation." (J.A. 60.) Although Whitley may be capable of performing the light work that constitutes most of a Wal-Mart truck driver's responsibilities, his inability to perform even a single and infrequent, yet essential, job requirement renders him disabled under Hartford's policy. Specifically, we find nothing in the record to indicate that Whitley is capable of exerting 120 pounds of force. All evidence on both sides is to the contrary.

In short, Hartford has not presented any evidence with regard to how Dr. Turner, a physician who had never examined Whitley, could accurately deduce how long Whitley could sit at a time or the amount of force with which he could push or pull. Similarly, there is no evidence in the record of the process used by Dr. Abda to arrive at her conclusion that Whitley could sit for two to four hours at a time or could push or pull with 100 pounds of force, given she had concluded after an office visit that Whitley could sit for only half an hour and push or pull only ten pounds. (<u>Compare</u> J.A. 325 with J.A. 329.) Perhaps tellingly, Dr. Abda's Progress Note on March 5, 2003 states that she agreed that Whitley could perform "light duty work," yet she removed the sentence stating that Whitley "appears capable of performing his own

17

occupation as a truck driver full-time" from the October 29, 2003 letter Dr. Turner drafted for her to sign. (J.A. 329.) Dr. Abda instead indicated that Whitley was at a 25% permanent partial impairment of his spine. Thus, it seems the only medical professional willing to state explicitly that Whitley could return to work <u>as a Wal-Mart trucker driver</u> had never actually seen him.[5]

In light of the functional capacity evaluations,[6] Hartford's nurse's review of Whitley's abilities,[7] and Dr. Schaffer's evaluation,[8] Whitley provided sufficient proof of his continued

---

[5]Dr. Schaffer noted in his report that Dr. Abda indicated that "[i]t was her opinion that the patient could be able to do light duty work but she says <u>nothing</u> about going back to long distance truck driving." (J.A. 559 (emphasis in original).)

[6]The first functional capacity evaluation, performed in March 1999, found Whitley capable of carrying only 20 pounds, pulling 53 pounds, and pushing 36 pounds and that he could sit only up to one hour without pain. The second functional capacity exam in November 2001 indicated that Whitley could push with an average of 40.5 pounds of force, pull with an average of 42.83 pounds of force, and sit up to 35 minutes.

[7]As previously stated, in December 2001, Hartford employed a registered nurse to review Whitley's second functional capacity evaluation. The nurse found the results to be valid and recommended an employability analysis based on those results.

[8]Dr. Schaffer wrote:
It is my medical opinion that this patient is totally disabled from returning to long distance truck driving. His job requirements are clear. They indicate the need for forceful pushing and pulling, extraction of pins requiring up to 130 [sic] lbs. of force and operating trailer doors which at times stick. These are in a addition to 1-5 hours of prolonged sitting in a bouncing truck cab. Quite frankly, if I were a CDL examiner I would fail this patient on his medical application for continuation of that license based on my belief that he

18

disability, as required by the terms of Hartford's policy. Conversely, Hartford provided no substantial evidence that Whitley, in fact, could perform all of the essential functions of his job. We hardly find the medical opinions of one doctor based solely on secondhand information and another doctor preoccupied with Whitley's performance at the gym, whose evaluation a year earlier yielded completely different results, to be thorough or persuasive when viewed in conjunction with the medical evidence supporting Whitley's continued disabled status. Given that Hartford's termination of Whitley's benefits turned on the evaluations of one medical professional who never performed a firsthand evaluation of Whitley and another who based her conclusions on her non-medical observations of Whitley at a local gym, as well as surveillance

---

> would be a dangerous hazard to traffic in addition to aggravating his physical condition. One cannot maintain the continuous mental concentrations that are required to operate a vehicle weighing up to 85,000 lbs. at speeds up to 75 m.p.h. when one is experiencing pain. Such distractions would make that driver inattentive and liable for failing to avoid accidents which other physically fit drivers would have no trouble avoiding.

(J.A. 559.) When asked if the surveillance tapes altered his analysis of Whitley's abilities, Dr. Schaffer replied:

> I see nothing in these films which would alter my opinions as expressed in my report of 9/16/03 to you. I did note that Mr. Whitley walked with a flexed forward gait which was certainly not brisk and unusually slow and quite deliberate. The comments of him [sic] standing around talking to acquaintances were noted to be interrupted with moving around frequently, not standing in a fixed position and on at least one occasion appearing to lean against a truck bed.

(J.A. 561.)

19

videos depicting Whitley performing a variety of irrelevant physical activities, we hold that Hartford failed to present substantial evidence to support its determination that Whitley was no longer disabled. Moreover, Hartford did not present a shred of evidence that Whitley could perform the "heavy" to "very heavy" essential duties of his job.

In sum, the anonymous letter Hartford received in March 2001 obscures the central issues of Whitley's claim. Whitley initially received disability benefits due to his limitations regarding sitting and lifting. The heavy emphasis placed on Whitley's purported ability to engage in unrelated activities based on the letter and surveillance videos, rather than on his ability to perform all of the essential duties of a Wal-Mart truck driver, is misplaced. Ironically, the objective tests and evaluations requested by Hartford, in response to the anonymous letter, effectively proved Whitley's continued disability. Even the doctors upon whom Hartford relies were not of the opinion that Whitley could exert enough force to perform the medium to heavy tasks associated with his former job. We, therefore, hold that Hartford's decision to terminate Whitley's benefits was unreasonable.

V.

Given the medical evidence in support of Whitley's continuing total disability and the unreliability of the evidence to the contrary, Hartford failed to present substantial evidence in support of the termination of Whitley's benefits. We thereby reverse the district court's judgment and remand for entry of judgment in Whitley's favor.

REVERSED AND REMANDED WITH INSTRUCTIONS

21